## STEVENS *et al. v.* STEADMAN *et al.*

The court erred in refusing to sustain a general demurrer to the petition in this case, which was an action brought by a widow against the defendants to recover damages for the tortious homicide of her husband, it being alleged that the defendants, in pursuance of a conspiracy to bring about the death of the plaintiff's husband, had written a letter calling upon the decedent to resign his official position in a corporation of which he was vice-president, and advising him not to inquire into the reasons for the demand; and that, owing to the nervous condition of the decedent and his impaired mental and physical condition, this letter, which was delivered to and read by him, had the effect of causing him to take a potion of some narcotic or drug which caused his death, and that the defendants intended and knew that the letter should produce this effect and bring about the death of the decedent.

OCTOBER 4, 1913.

Action for damages.  Before Judge Meadow.  Madison superior court.  August 24, 1912.

Mrs. Mattie Steadman, for herself and in behalf of her three minor children, brought an action against O. A. Stevens and nine other defendants, for the alleged wrongful homicide of G. M. Steadman.  So much of the petition as needs now to be considered was to the following effect:  G. M. Steadman, hereinafter referred to as the decedent, was the husband of Mrs. Mattie Steadman, and the father of the three minor children.  He and the defendants were stockholders of the Tiller-Glenn Company, a domestic corporation doing an extensive and lucrative business.  He was vice-president and assistant general manager of the corporation, and owned ten shares of its capital stock, which by reason of his efficient management of the affairs of the corporation, had about doubled in value since he became a stockholder.  He "was naturally of a very nervous, excitable temperament."  About two years prior to the time hereinafter referred to, "he had an attack of fever, which left his kidneys affected, and causing him thereafter to suffer more or less with dyspepsia, and occasional attacks of neuralgia, which tended at times to augment his said nervous disposi-

tion, and rendered him more easily influenced and depressed by unjust criticism, or other improper action or conduct of others towards him;" and "each and all of these facts were well known to said defendants." O. A. Stevens, one of the defendants, was bookkeeper for the corporation, and had held such position for many years. He was related by blood or marriage to all of the other defendants. He "had a grudge against" the decedent, and, "for the purpose of humiliating [him] and driving him out of said business, and that he, O. A. Stevens, could finally get rid of [decedent] and get him out of his way, and dispose of him finally, and that they [the defendants] might thereafter buy in the stock of [decedent] at a greatly reduced value after [decedent] was dead and finally disposed of, as it was intended he should be thereby, conceived the idea of bringing unjust, unfounded, and mysterious charges against [decedent], well knowing the disastrous and probably fatal result that the same would have on and to [decedent] owing to his very nervous temperament and state of health." And the other defendants, "likewise well knowing the said facts, conspired and confederated with the said O. A. Stevens to bring about said end. With this end in view, and well knowing the disastrous and fatal results that would be caused thereby to [decedent] on account of his nervous temperament and state of health, which was well known to them, the said O. A. Stevens and other defendants conspiring and confederating with him prepared and had served on [decedent] a paper which contained vague and mysterious and unfounded charges, and threatened that if he did not turn over his keys to the president without question, and resign his position in said company, and sever his connection therewith immediately, it would be worse for himself and his family, and that they would at once have him discharged from said company. and driven from the business, and thus publicly humiliate and mortify him. Said paper being signed by each and all of the defendants, and also having added a clause containing an oath to the effect that they would not mention their reasons to any except the members of said firm. Said oath clause being likewise signed by each and all of the defendants."

A copy of the paper was attached to the petition, to meet a special demurrer, and was as follows: "To G. M. Steadman, Carlton, Ga. We, the undersigned members of the firm of Tiller-Glenn

Co., respectfully ask that you resign your position immediately upon presentation of this notice. Unless same is done, we will at once discontinue your services any longer. We would ask that you not inquire into the details for reasons: 1st, because it will be best for you and your family; 2nd, because it will be best for our firm; 3rd, because we know you will not try to force your service on us when we did not want it, and are not satisfied with it, and won't have it. You will be at liberty to hold on to your stock in said firm or corporation, or to sell, as you desire. (We are willing to let our friendship and sociality remain as before. )We do not propose to mention our reason for this to any one except the signed members of this notice which appears below, unless we are forced to in order to protect our business; this we make oath to below. This is only a business matter with us, and have caused us considerable trouble for several months. We will all sell out before we will accept your service any longer. If you will buy all of us, then we will get out. You will exercise good judgment to resign at once, deliver your keys to the president without any questions whatever. We sincerely wish for you all the good luck that a young man might have, and that your relations towards us and ours towards you may be pleasant. We request the secretary and treasurer to keep copy of this notice and to enter same into the minute book of said firm. Witness our hands and seals this 7th day of September, 1911." Signed by the defendants.

"Now come the above signed members of the firm of Tiller-Glenn Co., who on oath say that they will not mention their reasons to any one except the members of said firm, unless the said G. M. Steadman begin saying some unpleasant things about said firm, trying to damage said firm in any way." Signed, sworn to, and subscribed by the defendants.

The paper was delivered to the decedent by one of the stockholders on Saturday night, September 9, 1911, after he had left the store and the business for the week had been closed. Decedent, as the defendants knew, had a number of business engagements with the customers of the corporation on the following Monday. "The time, place, and manner of thus imposing on [him] these unjust and mysterious charges and threats, and which it was stated would not be explained or discussed with him, and which he was not to attempt to discuss with them, or any of them, or to investigate

under said mysterious and dire threats, was further calculated, as was well known to defendants and intended by them, to throw [decedent] into a high state of nervous excitement, to unbalance him, and to cause his reason to become dethroned, and in such unbalanced and uncontrolled condition to take his own life in order to be rid of the nameless horrors by which they had surrounded him, and from which, it would seem to him in his said unbalanced condition which was produced by their illegal and criminal conduct, there was no other escape from." He had ever been an upright and honest official of the corporation, and had faithfully discharged his duties as such, and defendants had no just cause of complaint against him; and the first intimation he had that defendants had anything against him, or any desire or intent to injure him, was the delivery to him of the paper containing the unfounded and mysterious threats and charges against him. He "was greatly mortified and rendered very nervous and excited" by reading the paper, and "begged and implored the deliverer of said paper to inform him what the said defendants had against him, and with what did they seek to charge him, and why did they threaten publicly to disclose him, as aforesaid, and without any just cause whatever." The bearer of the paper declined to give him any information on the subject, by reason of his promise to the other defendants not to do so. The natural result of said conduct on the part of the defendants, "and as was known and contemplated by the defendants that it would be, owing to his nervous temperament and state of health, [decedent] was rendered very nervous and excited, could not sleep and could not eat, and was in a state of great despondency and despair all day Sunday, owing to said mysterious charges and direful threats." Late Sunday afternoon he found another of the defendants and endeavored to ascertain from him the same information he had sought from the other defendant, but with like failure to do so. He was thus rendered more nervous and excited and became very despondent. The making of such mysterious charges and threats against him and the refusal of the defendants to inform him of their nature, so that he could explain and refute them, and "owing to his nervous temperament and condition of health, which was well known to them, caused him to become unbalanced, and his reason to be dethroned, and, while in such condition, to take a large amount of morphine or other narcotic, hoping thereby, in his un-

balanced and unreasoning condition, to escape from the horrors of said nameless charges and threats and the public disgrace threatened by them. From which said large dose of narcotic he died on the following Monday morning, his death being due and chargeable to the illegal and criminal conduct of the said defendants, as aforesaid, and the natural and almost inevitable result of the illegal and criminal conduct of said conspirators, and in their contemplation in signing and sending said paper, and in making said charges and threats to him." The plaintiff "charges that the said conduct of said O. A. Stevens and the other defendants who conspired with him, as hereinbefore stated, was a criminal conspiracy resulting in the death of her husband, as was in contemplation of and intended by the said O. A. Stevens with the other defendants conspired and confederated, as hereinbefore stated; and that each and all of them are liable to her therefor." The defendants demurred to the petition, on the grounds, that it set forth no cause of action, in that the injury complained of was not actionable, that the damages claimed were too remote to be recoverable, and that the charges made were not the proximate cause of the injury complained of. The demurrer was overruled, and the defendants excepted.

*Worley & Nall, Paul Brown, J. F. L. Bond,* and *John J. & Roy M. Strickland,* for plaintiffs in error.

*John E. Gordon, B. T. Moseley, E. K. Lumpkin,* and *E. K. Lumpkin Jr.,* contra.

BECK, J. (After stating the foregoing facts.) Evidently, from the allegations of the petition in this case, the plaintiff seeks to show a cause of action arising out of the tortious homicide of her husband. We do not think that when all the allegations are considered it is made to appear that the defendants committed any tortious act which has any causal relation to the death of the plaintiff's husband. However odious such a conspiracy as that charged upon the part of the defendants may have been, and however reprehensible their conduct, the resulting product of the alleged conspiracy was not a crime under the Code of Georgia. It was a letter which subsequently went into the hands of the plaintiff's husband, and after the reception of it he took an overdose of some narcotic or drug, from the effects of which death ensued. But we do not think that it can be charged, so as to withstand a general demurrer, that the letter which was written to and received by the decedent

was the cause of the unfortunate man's act in taking the drug. We say that such a fact can not be so charged as to withstand a general demurrer. Of course, such a charge can be put into words and the words can be made a part of the petition, and they may be so formulated as to make a clear, distinct statement alleged to be a fact; the idea at the time of stating it, in the mind of the pleader, may be called a fact, and may be so stated that it could be said of it that it was well pleaded, and therefore that the rule that all facts well pleaded should be taken as true should be applied. But it is not unusual that when some statement which is insisted upon as a statement of fact is contrary to natural law and universal experience, it is held to be demurrable. For instance, in the case of *Southern Railway Co.* v. *Covenia,* 100 *Ga.* 46 (29 S. E. 219, 46 L. R. A. 51, 52 Am. St. R. 312), where it was alleged that a child one year, eight months, and ten days old was capable of rendering services to its parent of the value of two dollars per month, it was held as a matter of law that a child of the tender years alleged was without earning capacity. And so in this case, when it is charged that the letter alleged to have been written by the defendants would, when read by the decedent, naturally result in a certain state of mind upon the part of the decedent, and that this "was known" by the defendants, we are prepared to hold that this was not such a statement of fact as will withstand a demurrer. What is termed fact is, after all, in such cases merely a conclusion of the pleader, though it is set forth as fact and put in the place of a fact among other facts joined together in laying the foundation of the plaintiff's case. While the state of mind produced in the decedent, and as a result of which it is charged that he took the fatal potion, may be to some extent traceable to the reading of the letter, it can not be said to be the legal and natural result of the act of the defendants. It must be borne in mind that there was nothing said in the letter which could bring the writers of it within the category of those who advise or counsel one to commit a specific act or to take a certain line of conduct looking to the termination of the life of the one counseled, as in those decisions dealing with cases of persons advising, aiding, or abetting another to commit suicide, and holding that the one so advising or abetting may be convicted of murder, whether he be absent or present at the time of the suicide. The writers of the letter now under consideration, which it is charged had such

direful consequences, did not advise or counsel the plaintiff's husband to take a drug or narcotic, nor did they advise or counsel him to commit suicide. If they had advised him to commit suicide and he had then taken the drug with suicidal intent, the case of the defendants might have fallen within the class of cases above referred to. But the plaintiff, in the absence of any word or statement in the letter showing the intent of the writers thereof, charged that they did it with the intent to produce a certain mental effect, and that they knew what effect it would have. It is true that juries are called upon frequently to say what intention existed in the mind of a person in performing certain acts, but that is where the person whose intention was sought had performed some act the natural result of which could be foreseen. Whosoever uses a gun and shoots another, inflicting a wound from which death results, is presumed to have intended the death of the one who is shot. But in such a case there is a natural causal connection between the shooting and the death, and the one who does the act is presumed to have intended the natural consequences thereof. But we do not think it can be said that any one could know that the effect of a letter containing a request for the person to whom it was addressed to resign from a certain position, and advising him to make no inquiry as to the reasons for the demand, would be to cause him to adopt any particular line of conduct, whether the person receiving the letter was sane or insane. If the defendants in this case were guilty of the tortious homicide of the decedent, they were guilty of murder, because the homicide was committed with the circumstances all indicating malice aforethought. But does any one believe for an instant that the defendants should be held to be guilty of murder under the statutes of Georgia, under the facts alleged in this petition, as in the case of one who aids and abets and counsels a suicide, where suicide upon the part of the one advised and counseled follows? Suppose that a grand jury should return an indictment charging A with the offense of murder, for that A, being the son of B, who was a wealthy man, for the purpose of causing his father's death, knowing that the latter was of a nervous and excitable temperament and that he loved his son even in excess of the usual measure of paternal affection, and that it would break his heart should the son commit any act that was dishonorable or which exposed the son to public hatred or contempt, had written a letter to his father threatening at once to begin a

career of notorious shamelessness, and, knowing that this letter would cause such a shock to the father as to result in his immediate death, had caused it to be delivered into the hands of his father, with intent that it should cause the father's death, and that the father upon reading it had immediately died of a broken heart; and that all this was done with malice aforethought, contrary to the laws, etc. Would this court hold for an instant, in case the judge of the trial court should overrule a demurrer to such an indictment, that the judgment should be permitted to stand, for that all facts well pleaded are admitted, and that the facts here pleaded show a wrongful and a malicious homicide? We think that this question answers itself and answers it in the negative, and that the supposed case, legally viewed, is a close parallel to the case under consideration. I do not think that it could be successfully charged, so as to uphold an indictment, that A illegally and wrongfully pursued a course of conduct which was calculated to break the heart of B, that the breaking of the heart of B was the known and natural consequence of A's conduct, that B's heart did break as the result of A's conduct, that B then and there died, and that A had pursued that course of conduct with malice aforethought, intending to break B's heart, and that he was guilty of murder. Mere positiveness of the terms alleging the psychological results which we have set forth above would not prevent the court from holding, upon demurrer, that the results charged could not have been the known and natural results of the acts charged against the accused; although it might be different if it were charged that A had advised B to kill himself by shooting himself with a pistol or by taking poison. For there the accused would have been counseling and advising the commission of a physical act which it might be said would naturally and probably have tended to produce certain results. We are of the opinion, that, in the present state of our knowledge concerning the laws governing the operation of the mind, it can not be asserted that any particular state of mind would naturally result on the part of a person who received a communication from another person, or that the communication would have the effect of causing the person receiving it to perform any certain physical act, in the absence of suggestion, advice, or counsel that he should do that particular act.

*Judgment reversed. All the Justices concur, except Lumpkin, J., disqualified.*

Fish, C. J., and Hill, J., concur in the judgment.