**WHOLE COURT**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 30, 2015**

# In the Court of Appeals of Georgia

A14A2105. TUCKER v. PEARCE et al.                                   DO-107

DOYLE, Presiding Judge.

Tammy Pearce ("the Plaintiff"), individually and as administrator of the estate of her husband, Christopher Pearce ("Pearce"), filed a wrongful death suit against Glynn County Police Officer Henry Tucker after Pearce committed suicide while in the custody of the Glynn County Police Department. Officer Tucker filed a motion for summary judgment, and, following a hearing, the trial court denied in part Officer Tucker's motion.[1] Officer Tucker appeals, contending that the trial court erred by denying his motion for summary judgment because any negligent acts on his part

---

[1] The plaintiff also named Glynn County and Officer William Tomlinson as defendants. The trial court granted summary judgment to Glynn County and Officer Tomlinson, and it granted partial summary judgment to Officer Tucker on the basis that some of his acts were discretionary, entitling him to official immunity as to those acts. The plaintiff does not appeal those orders.

were discretionary and because there was insufficient evidence that his acts proximately caused Pearce's death. For the reasons that follow, we reverse.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[2]

On appeal from a denial of a motion for summary judgment, we conduct a de novo review of the evidence.[3]

So viewed, the evidence shows that Pearce suffered from major depressive disorder. On Sunday, October 26, 2008, Hugh Harrison, Pearce's pastor at the People's Liberty Baptist Church, noticed that something was bothering Pearce. Pearce told Harrison that Harrison had been a good friend to him, and Harrison thought it was odd that Pearce used the past tense.

Later that night, around 9:45 p.m., Pearce rang the doorbell at Harrison's home. Harrison looked out of the peephole, and when he observed that Pearce was holding a gun, Harrison retrieved and loaded his own gun. Meanwhile, Harrison's wife called

---

[2] (Citation and punctuation omitted.) *Home Builders Assn. of Savannah, Inc. v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

[3] See id.

911 and reported that Pearce had a gun and was possibly on medication. A few minutes later, Pearce again rang the doorbell of Harrison's home and knocked on the door with the butt of his gun.

At approximately 10:15 p.m., Officers Tucker and Tomlinson arrived at Harrison's home in response to the 911 call. Pearce was walking down Harrison's driveway towards the officers as they arrived. The officers stopped their cars, got out, and approached Pearce, who had tucked his gun in the back of his waistband. The officers then drew their weapons. On Officer Tucker's orders, Pearce put up his hands and got down on his knees, and Officer Tomlinson took Pearce's gun.

Officer Tucker handcuffed Pearce, and the officers placed Pearce in the back of Officer Tucker's patrol car. Other than indicating that his shoulder hurt, Pearce did not say anything to the officers, and he had a blank look on his face. Pearce was cooperative, , but his silence and "weird look" struck Officer Tucker as odd.

While still at the Harrisons' residence, Officer Tomlinson retrieved Pearce's driver's license, which was wrapped in two notes. The first note read, "Tammy and kids, [not] your fault. I love you and always will." The second note, which was signed "Chris," read, "[Too] much PAIN. [Too] much [RIDICULE]. NO UNDERSTANDING. NO MORE PAIN. FORGIVE ME!" Although Officer

3

Tomlinson stated in his supplemental police report that he and Officer Tucker reviewed the notes, at his deposition, Officer Tomlinson testified he believed he shared them with Officer Tucker at some point, but could not remember if it was at the Harrisons' or back at the station; he did not recall discussing the notes with Officer Tucker at all. Officer Tucker could not recall whether he read the notes. Nonetheless, Officer Tomlinson testified that he did not perceive the notes to be suicide notes.

After placing Pearce in the car, the officers went inside the Harrisons' house. Harrison told the officers that Pearce was not acting like himself at church that day or evening and that Pearce seemed upset. Harrison also told police that Pearce had previously been in prison. Officer Tomlinson recalled that Harrison told him that Pearce "had been suffering from problems with his shoulder and had been in a lot of pain." Harrison did not mention that Pearce might have been on medication,[4] nor did he indicate any concern regarding Pearce's mental health.

Officer Tomlinson called ahead to Glynn County Police Department headquarters and requested a criminal history report on Pearce to determine whether

---

[4] Officer Tucker also does not recall whether the 911 dispatcher advised him that Harrison's wife mentioned that Pearce might have been on medication.

Pearce was a convicted felon. Officer Tucker then transported Pearce to police headquarters to detain him there pending a review of his criminal history.

When Officer Tucker arrived at headquarters shortly before 11:00 p.m., he got Pearce out of the car and walked him inside. Pursuant to standard procedure and not because of any concerns regarding the possibility of Pearce harming himself, Officer Tucker had Pearce remove his shoes, belt, tie, and the contents of his pockets. Officer Tucker then patted down Pearce and placed him in a holding cell, which contained a video camera. Officer Tucker advised dispatch that there was a detainee in the holding cell so that dispatch could monitor the cell through the connected video feed.

Officer Tucker also filled out a holding cell property receipt for Pearce's personal property and had Pearce sign the receipt, which was stapled to a holding cell medical screening form that, pursuant to police department policy, officers were required to complete prior to placing an individual in a holding cell.[5] The form was

_____

[5] Glynn County Police Department Order 22.16.3 (E) provides that: "[t]he purpose of the screening is to determine whether medical attention is required of the person to be detained." The form includes blanks for basic information including the date, the officer's identifying information, and the detainee's name and address, as well as boxes with space to provide information in the following four categories: "Health condition," "Medications," "Behavior," and "Body (Cuts, Bruises, Etc.)" The form does not provide the methodology officers should use when gathering the information to complete the form, nor does it specifically require an officer to assess a detainee's suicide risk. With the exception of inquiring regarding medication,

5

not completed, nor was it submitted to the on-duty supervisor, as required by police department policy. According to Officer Tucker, who was responsible for completing the medical screening form, he forgot to do so for Pearce.[6] Officer Tucker later testified, however, that he did not believe that Pearce "was in any danger of hurting himself." Instead, based upon his observations of Pearce, including his possession of a gun and the Harrisons's statements to police, Officer Tucker believed that Pearce had gone to the Harrisons' home to inflict harm upon them.

After leaving Pearce in the holding cell at approximately 10:54 p.m., Officer Tucker went to his sergeant's office, where he was joined by Officer Tomlinson. At 11:01 p.m., another officer checked on Pearce, who appeared to be fine. At approximately 11:15 p.m., Officer Tomlinson left the sergeant's office and discovered Pearce in the corner of his holding cell, with little color in his face. Officer Tomlinson yelled for assistance, and Officer Tucker and the sergeant ran to the holding cell. Officer Tucker opened the holding cell door and saw Pearce slumped in the corner between the door and the wall, blue in the face. Officer Tucker performed CPR until

---

officers are not required to make verbal inquiries of a detainee when completing the form and may instead simply note their observations.

[6] Officer Tucker was disciplined for failing to complete the medical screening form.

6

emergency medical personnel arrived, and Pearce was transported to the emergency room, where he was pronounced dead at approximately 11:45 p.m. Surveillance footage of the holding cell showed that Pearce had committed suicide by tying together his socks and hanging himself from a door hinge. At most, 21 minutes elapsed from the time Pearce was placed in the holding cell and when officers discovered him not breathing in his cell; no more than 14 minutes elapsed between when Officer Rainey checked on him and officers noticed him not breathing.

On appeal, Officer Tucker argues that the trial court erred by denying his motion for summary judgment on the ground of official immunity and because there was insufficient evidence that his acts proximately caused Pearce's death. Pretermitting whether official immunity bars the plaintiff's claims against Officer Tucker, the trial court erred by denying him summary judgment because there is no justiciable issue of causation.

The issue here is whether Officer Tucker's failure to medically screen Pearce "was the proximate cause of [Pearce's] suicide or whether the suicide was an unforeseeable act that was not caused by [Tucker's] failure to [act]."[7]

---

[7] *Harvey v. Nichols*, 260 Ga. App. 187, 193 (2) (581 SE2d 272) (2003).

From a legal point of view, proximate cause means that the suicide must have been a foreseeable result of the negligence of the tortfeasor. Negligence is not actionable unless it is the proximate cause of the injury. A wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. *Generally, suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability*. Although, there is an exception to this general rule: Where the tortfeasor's wrongful act causes the injured party to kill himself during a rage or frenzy, or in response to an uncontrollable impulse, the wrongful act is considered to be the proximate cause of the suicide.[8]

In *Harvey v. Nichols*, the plaintiff filed a wrongful death action against the sheriff, the jail manager, and two detention officers after 17-year-old Thomas Reagin hung himself with a bed sheet in a holding cell.[9] During booking, Reagin revealed that he had "some" psychiatric problems as a child and had undergone anger management, but according to a county officer, "Reagin did not appear to be a danger either to himself or others, and . . . he gave no indication of unusual behavior. However, because of Reagin's age and the seriousness of the crime with which he

---

[8] (Punctuation omitted; emphasis supplied.) Id., quoting *Dry Storage Corp. v. Piscopo*, 249 Ga. App. 898, 900 (550 SE2d 419) (2001).

[9] See *Harvey*, 260 Ga. App. at 189-190.

was charged, [the officer] wrote on the intake form that Reagin should be placed in an observation cell 'due to high risk.'"[10]

Later, after meeting with Reagin for 30 to 45 minutes, reviewing the nurse's notes, and speaking with a detective regarding his impressions of Reagin, the jail manager reassigned him from an observation cell to a holding cell at approximately 4:00 p.m.[11] Detention Officers Ledford and Gardner were responsible for monitoring the holding cells.[12] There was conflicting evidence regarding whether Ledford and Gardner took Reagin his dinner at 5:30 p.m. or 7:30 p.m., and although Ledford claimed to have checked on Reagin between 8:00 p.m or 8:15 p.m, there was no corresponding entry made in the log book.[13] At 9:13 p.m., Ledford found Reagin hanging in his cell.[14]

---

[10] Id. at 188.

[11] See id. at 188-189.

[12] See id. at 189. The "[j]ail had established policies and procedures which governed the surveillance of inmates. All prisoners were to be observed on a regular basis, the frequency of observation depending on whether the prisoner was housed in an observation cell, a holding cell, or the general population." Id. at 192 (1) (b).

[13] See id. at 189.

[14] See id.

9

We concluded that "[t]he actions of Ledford and Gardner, dictated as they were by established procedure and requiring merely the execution of a specific duty, were ministerial in nature," and because there was some evidence that they failed to monitor Reagin "on a regular basis and were thus negligent in performing their duties, . . . the trial court erred [by] granting summary judgment to [them] on official immunity grounds."[15] We also concluded, however, that

> there was no evidence that Reagin's suicide was a probable consequence of the detention officers' failure to monitor his cell. All of the jail personnel who encountered Reagin testified that he acted in a normal fashion, was outgoing and under control, and readily spoke with the officers. Nothing about his behavior suggested anything out of the ordinary or that he might be a danger to himself. Reagin was not placed on suicide watch. Nothing in the record before this Court suggests that, if the surveillance protocol had been followed, Reagin would not have been able to take his own life. Any assertion that Reagin's attempt at suicide would have been unsuccessful if procedure had been followed is pure speculation.[16]

---

[15] Id. at 192-193 (1) (b).

[16] Id. at 193-194 (2).

Accordingly, we affirmed the grant of summary judgment to Ledford and Gardner because "as a matter of law," their "failure . . . to observe Reagin on a regular basis was not the proximate cause of Reagin's [suicide]."[17]

Here, as in *Harvey*,"[t]here is no evidence that [Pearce] was in a rage or frenzy or had an uncontrollable impulse when he took his life. On the contrary, [Pearce] was calm and controlled and appear[ed] to have known what he was doing."[18] Accordingly, the exception does not apply, leaving the general rule regarding suicide and proximate cause that "suicide is an unforeseeable intervening cause of death which absolves [Officer Tucker] of liability."[19] Viewed in favor of the plaintiff, there is no evidence that Pearce would have been unable to commit suicide if Officer Tucker had medically screened him before placing him in the holding cell. The plaintiff's argument that during such a screening Pearce would have offered information or acted in a manner indicating that he was a suicide risk or that Officer

---

[17] Id. at 194 (2). We also noted that "[t]he exception to the general rule regarding proximate cause and suicide does not apply." Id.

[18] Id.

[19] (Punctuation omitted.) Id. at 193 (2).

Tucker would have concluded that Pearce was a suicide risk is purely speculative.[20] And "uninformed speculation[,] which raises merely a conjecture or possibility is not sufficient to create even an inference of fact for consideration on summary judgment."[21] Pearce's suicide was an unforeseeable intervening act for which Officer Tucker was not liable, and therefore, the trial court erred by denying Tucker's motion for summary judgment.[22]

*Judgment reversed. Phipps, C. J., Andrews, P. J., Ellington, P .J., Dillard and McMillian, JJ., concur*. Miller, J., dissents.

---

[20] The plaintiff argues that Pearce's suicide would have been prevented if the medical screening had resulted in a determination that Pearce was suicidal and he was transported to a hospital. Given the department policy that individuals exhibiting signs of mental distress should be transported to the hospital *after consultation with the watch commander* and that Pearce committed suicide in the less than 22-minute window in which he was in the holding cell, this argument is also speculative.

[21] (Punctuation omitted.) Id. at 194 (2), quoting *Brown v. Amerson*, 220 Ga. App. 318, 320 (469 SE2d 723) (1996).

[22] See *Harvey*, 260 Ga. App. at 194 (2); *Appling v. Jones*, 115 Ga. App. 301, 307 (2) (154 SE2d 406) (1967) (physical precedent only).

A14A2105. TUCKER v. PEARCE et al.                    DO-073

MILLER, Judge, dissenting.

Everyday, our police officers do excellent work in the tough job of protecting and serving citizens and communities throughout the state of Georgia. Their work, often under difficult circumstances, is commendable. When a police officer, however, fails to follow his own department's policies and procedures, this Court cannot condone such actions, especially where, as here, simply following his department's policy may have prevented injury or death.

To prevail at summary judgment under OCGA § 9-11-56, Officer Tucker must demonstrate that there is no genuine issue of material fact and that the undisputed

facts, viewed in the light most favorable to Pearce, warrant judgment as a matter of law. See *Home Builders Assn. of Savannah, Inc. v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003). Where there are outstanding issues of material fact to be decided, summary judgment is not proper. See id. at 245 (2). For this reason, I would affirm the trial court's ruling.

On Sunday night on October 26, 2008, Christopher Pearce went to his pastor's home with a gun. The pastor had noticed that something was bothering Pearce earlier that day at church service. Obviously concerned, the pastor called 911 and Glynn County Police Department Officers Tucker and Tomlinson responded and took Pearce into custody and down to the police station. Less than an hour after being taken to the police station and having been placed in a holding cell, Pearce was dead.

Police officers' discretionary actions are covered by official immunity. See *McDowell v. Smith*, 285 Ga. 592, 593 (678 SE2d 922) (2009). This protection is essential so that they can confidently and expeditiously do their jobs. Police officers, however, have certain routine acts that are ministerial in nature. See id. (a ministerial act is one that is simple, absolute, and definite, requiring merely the execution of a specific duty). These acts are part of the routine duties that police officers are trained to perform each and every day. After taking someone into custody and placing him

2

in a holding cell, Glynn County Police Department officers must, among other things, inquire into a detainee's health, fill out a medical screening form and submit the completed form to their on-duty supervisor. Glynn County Police Department Order 22.16.3 (E) provides:

> The officer must fill out the screening form noting and *inquiring* as to: 1. The current health of the detainee[;] 2. *Medications* taken by detainee[;] 3. *Behavior, including* state of consciousness and *mental status*[;] and 4. Body deformities, trauma markings, bruises, lesions, ease of movement, etc.

The majority does not address the threshold issue of official immunity. The acts of inquiring into the detainee's health, completing the medical screening form and giving the form to the on-duty supervisor were simple, absolute, definite, and mandatory acts, governed by clear Department policies and procedures. These were unquestionably ministerial acts.[1]

---

[1] See *Clark v. Prison Health Services, Inc.*, 257 Ga. App. 787, 793-794 (4) (a), (b) (572 SE2d 342) (2002) (alerting shift supervisor of detainee's mental health referral and performing mental health assessment were ministerial acts); see also 1983 Ga. Const. Art. I, Sec. II, Par. IX (d).

3

Viewing the record in the light most favorable to Pearce, there were numerous red flags that would have alerted a reasonable person that Pearce was suicidal.[2] In this case, Pearce went to his pastor's home with a gun; Pearce was carrying two suicide notes, stating that he was in too much pain and seeking forgiveness; it was reported to police that Pearce was possibly on medication; and Officer Tucker undeniably knew that Pearce was acting abnormally.[3] Despite all these red flags, Officer Tucker failed to complete the medical screening form.

Contrary to the majority's contention that the policy did not require Officer Tucker to talk to Pearce before completing the medical screening form, the policy specifically states that the officer must "inquire" as to the detainee's health, behavior, medications, and markings. An inquiry is required by both the form and the policy on

_____

[2] Suicide warning signs include: making statements about suicide; getting the means to commit suicide, such as obtaining a gun; and withdrawing from social contact. See Mayo Clinic, Suicide and suicidal thoughts, Symptoms, http://www.mayoclinic.org/diseases-conditions/suicide/basics/symptoms/con-20033954 (visited March 26, 2015).

[3] Here, the evidence showed that Officer Tucker and Officer Tomlinson reviewed the suicide notes and knew that Pearce was possibly on medication. Although the majority states that there is conflicting evidence as to these issues, any conflicts in the evidence certainly raise material issues of fact for the jury.

4

its face.[4] Here, there is no evidence that the officers investigated, inquired into or asked about any of these factors. Inquiring into Pearce's health could have revealed his suicidal intentions.

The department's medical screening policy is in place specifically to determine whether a person being detained has any physical or emotional problems that need medical attention. Given all the evidence in this case, Officer Tucker's failure to fulfill his ministerial acts raises genuine issues of material fact for the jury as to whether Officer Tucker was negligent and whether the simple acts of inquiring into Pearce's health, completing the medical screening form and notifying the on-duty supervisor would have alerted the officers to provide some care that could have prevented Pearce's death. See *Meagher v. Quick*, 264 Ga. App. 639, 644 (1) (594 SE2d 182) (2003) (where officers failed to fulfill the ministerial duty of completing a report, there was a genuine issue of material fact as to whether their failure to do so resulted in a child's death).

---

[4] Inquire means to ask for information, or to search into. See Merriam-Webster, http://www.merriam-webster.com/dictionary/inquire (visited March 30, 2015). Nothing in the policy suggests that the officers' inquiry is limited to medications. In fact, the policy explicitly states that the officers must inquire into all four areas.

The majority's assertion that Pearce's theory of causation is speculative and that the medical screening would not have revealed that Pearce was suicidal is misguided. This is not a plain and undisputed case where this Court can say, as a matter of law, that Pearce's suicide could not have been prevented. It is not for this Court to usurp the place of the jury and determine causation. See *Ogletree v. Navistar Intl. Transp. Corp.*, 245 Ga. App. 1, 3 (1) (535 SE2d 545) (2000) (issues of causation are for the jury to resolve and should only be determined as a matter of law in plain and undisputed cases). *Harvey*, which the majority relies upon, is not this case, on the facts or the law.[5] Moreover, Georgia has rejected the notion that suicide is per se an intervening act. See *Brandvain v. Ridgeview Institute, Inc.*, 188 Ga. App. 106, 116 (3) (b) (372 SE2d 265) (1988).

Officers cannot ensure the safety of everyone in custody and this case will not open the floodgates of litigation against them. Officers can, however, ascertain whether a detainee is at risk and take the necessary precautions. Public safety cannot

---

[5] In *Harvey*, this Court noted that, "[a]ll of the jail personnel who encountered [the decedent] testified that he acted in a normal fashion, was outgoing and under control, and readily spoke with the officers. . . . [The decedent] was calm and controlled and appears to have known what he was doing." (Citation omitted.) *Harvey v. Nichols*, 260 Ga. App. 187, 193-194 (2) (581 SE2d 272) (2003). Given all the red flags in this case, Pearce's demeanor, which Officer Tucker described as abnormal, is not determinative here.

6

stop at the jail house door, and police officers are not free to ignore the clear and specific requirements mandated by their department's policies and procedures. Contrary to the majority's opinion, this suicide might have been prevented if Officer Tucker had fulfilled his simple ministerial acts, which were intended to prevent exactly the type of harm that occurred here. Accordingly, this case cries out for a closer look by a jury.