BARNES, Presiding Judge,
concurring specially.
This case should not turn on whether the suicide victim killed herself in a rage, frenzy, or due to an uncontrolled impulse, or on whether the defendants had a special relationship with her. It should instead turn on a straightforward application of the tort concept of foreseeability. Applying that concept, a reasonable jury could find that the defendant police officer had reason to know that Sydney was particularly susceptible to suicide, and that her subsequent suicide was a foreseeable result of his sharing confidential information. Accordingly, the trial court did not err in denying summary judgment to the defendants on Maia’s wrongful death claim.
While I agree with the majority’s conclusion in Division 2 that the trial court did not err in denying the defendants’ motion for summary judgment as to the plaintiff’s wrongful death claims, I cannot agree with all that is said, and thus concur specially in that division. I concur fully in the analysis and conclusions in Divisions 1, 3, 4, and 5.
To analyze the legal principles in this case, both the majority and the dissent apply the framework articulated in Appling v. Jones, 115 Ga. App. 301 (154 SE2d 406) (1967) (physical precedent only) and developed in the 50 years that followed. That framework, which is not unique to Georgia, provides that “[gjenerally, suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability,” unless the injured party kills herself while in a rage, frenzy, or due to an uncontrollable impulse. Dry Storage Corp. v. Piscopo, 249 *569 Ga. App. 898, 900 (550 SE2d 419) (2001).[14]
After establishing the holding that suicide absolves the tortfeasor absent evidence that the victim killed herself in a rage, frenzy, or due to an uncontrolled impulse, our appellate courts have created exceptions to this holding, as ably described by the majority and dissent. Some of those exceptions involve defendants who have a special relationship to the injured party, such as psychiatrists;[15] others involve defendants who have physical custody and control over the injured party, such as jailers;[16] and still others involve both a special relationship and physical custody.[17] In this case, the majority finds a public duty exception to Appling’s holding, based on the defendant police officer’s special duty not to disclose confidential information. The dissents find no special-relationship exception and would hold that, because the record contains no evidence the victim acted from rage, frenzy, or uncontrolled impulse, the trial court should have granted summary judgment to the defendants.
But this case does not turn on whether the suicide was “voluntary” or not, or on whether a special relationship existed between the victim and the police officer, but rather on a straightforward application of the tort concept of foreseeability. Foreseeability informed the analysis in Stevens v. Steadman, 140 Ga. 680, 685 (79 SE 564) (1913), upon which Appling relied, in which our Supreme Court found that suicide was not “the legal and natural result” of the defendant-authors’ malicious letter to the deceased.[18] See C. T. Drexler, Annot., Civil Liability for Death by Suicide, 11 ALR2d 751 (1950); 22A AmJur2d Death § 41 (2016) (“The general rule in actions brought under a wrongful death statute is that suicide is an intervening force that breaks the line of causation from the wrongful *570 act to death[,] ... based on the theory that suicide is not an ordinary, foreseeable result of injury.”). Foreseeability also explains why we have created exceptions to the holding in Appling for special relationships involving treatment or control over the deceased.
Other courts have distinguished the holding set forth in Appling on foreseeability grounds, i.e., Sneider v. Hyatt Corp., 390 FSupp. 976, 980-981 (N.D. Ga. 1975);[19] Knight v. Wal-Mart Stores, 889 FSupp. 1532, 1542 (III) (C) (3) (S.D. Ga. 1995). As in Knight, this case involves a defendant who breached his duty “to a decedent who [he knew was] already contemplating the act,” not a defendant who “directly, negligently creat[ed] in the decedent the state of mind prompting suicide.” Id. Addressing the issue of proximate cause, the district court held: “It is basic common law that defendants remain liable where intervening acts between the negligence and the ultimate harm were foreseeable.” Id. at 1541 (III) (C) (3). See also Bornmann v. Great Southwest Gen. Hosp., 453 F2d 616, 624 (I) (B) (5th Cir. 1971) (“The cases disapproving suicide as a ‘new and independent cause’ generally involve situations where the defendant knows of the suicidal risk or has undertaken a specific duty to prevent suicide.”).
Further, while no Georgia appellate cases specifically distinguish Appling in the manner of the two federal cases cited above, that may be because in many cases, the parties or this Court do not address the issue of suicide through the framework of special relationships or whether the deceased acted in a rage, frenzy, or due to an uncontrolled impulse; rather, in those cases the suicide issue is reviewed using general concepts of foreseeability and qualified immunity. See, e.g., Hill v. Jackson, 336 Ga. App. 679 (783 SE2d 719) (2016) (defendant performing ministerial function, no qualified immunity); Ga. Clinic v. Stout, 323 Ga. App. 487, 492-493 (2), 494-495 (5), 496-497 (6) (747 SE2d 83) (2013) (affirming wrongful death verdict based on woman’s suicide three months after developing knee infection caused by malpractice); Miranda v. Fulton DeKalb Hosp. Auth., 284 Ga. App. 203, 206-207 (644 SE2d 164) (2007) (no causal connection between escape from restraints at Grady and death from leaping in front of moving vehicle on highway the following day); Minor v. Barwick, 264 Ga. App. 327, 336-337 (2) (590 SE2d 754) (2003) (immunity under State Tort ClaimsAct); Clark v. Prison Health Svcs., 257 Ga. App. 787, 791-792 (2), 793-794 (4) (572 SE2d 342) (2002) (ministerial function, *571 no qualified immunity); Purcell v. Breese, 250 Ga. App. 472, 475 (1) (552 SE2d 865) (2001) (proximate cause of suicide in medical malpractice case was a jury issue); Morris v.Baxter, 225 Ga.App. 186, 187 (483 SE2d 650) (1997) (no proximate cause between leaving loaded rifle in house and girlfriend using it to kill herself; “negligence is predicated on what should have been anticipated rather than on what happened”) (citation and punctuation omitted); McDay v. City of Atlanta, 204 Ga. App. 621, 622 (2) (420 SE2d 75) (1992) (suicide was unforeseeable); Brandvain, 188 Ga. App. at 115-116 (3) (b) (even if suicide were crime, a reasonably foreseeable criminal act does not break legal causal connection between negligence and damages). In other cases, we have cited Appling but then held simply that the suicide was not foreseeable under the circumstances presented. See, e.g., Harvey v. Nichols, 260 Ga. App. 187, 193-194 (2) (581 SE2d 272) (2003); Kobeck v. Nabisco, 166 Ga. App. 652, 654 (3) (305 SE2d 183) (1983) (no evidence negligence was proximate cause of suicide).[20]
Regardless of the validity of Appling’s holding and its exceptions,[21] this case is different. Knowing that Sydney, a high school student, had recently attempted suicide and been hospitalized as a result, questions of fact exist about whether suicide was a foreseeable risk of the police officer showing his teenage daughter pictures of her classmate Sydney’s self-mutilated body following Sydney’s prior suicide attempt. The defendants admit that the officer violated policy by showing the confidential photographs to his daughter, and his supervisor testified that the officer was remorseful afterward. The record shows that, four days before Sydney committed suicide, the officer was disciplined with two days’ suspension and the directive to review policy and “reflect on how disseminating confidential information can affect the victim and this department.” While the officer submitted an affidavit averring that he did not give his daughter access to the pictures or database, he did not dispute that she shared those images with other students, a fact supported by classmates’ affidavits that the daughter had shown them pictures of Sydney’s wounds.
*572 A review of the record de novo, including multiple affidavits and seven depositions, reveals a portrait of a “beautiful, smart,” popular, athletic high school freshman who did not like for people to see her upset. Her sister found Sydney on the morning of her suicide attempt on February 14, 2011, and described her wounds as “bad.” She had taken her sister’s medication and then used dull scissors to cut her neck from ear to ear “many times.” She then twice stabbed her left breast and twisted the blades to reach her heart, and deeply gouged her abdomen. When her mother took her to the emergency room, initially Sydney would not tell anyone what had happened, so the responding police officers documented her wounds with photographs. The digital images were printed for a paper file and then uploaded to the police department’s data management software, which the defendant officer subsequently accessed from his home to show his daughter.
After Sydney’s self-inflicted wounds were sutured and bandaged at the emergency room, Maia took her to Georgia Regional Hospital, where she spent nine days. She was discharged with the diagnosis of “adjustment disorder with depressed mood,” and returned to high school exactly two weeks after her February 14 suicide attempt. The cuts on her neck were almost completely healed; her sister was “shocked” at how minimal the scars were, considering how bad the wounds looked when first inflicted. Her clothing covered the injuries to her breast and stomach, and she often wore a hoodie with her hair down, “always trying to wear stuff to cover up the scar on her neck.” One friend said she “just put a smile on every day.” Her sister said “she kept her business quiet” and “made it look like she was ok,” and she apparently did her best to make her family and fellow students forget about her suicide attempt. Both her sister and mother testified that Sydney cared a lot about what people thought of her and wanted to get along with everyone.
A few days after she returned to high school, about four weeks before she committed suicide, Sydney found out that the defendant investigating police officer’s daughter had shown pictures of her wounds to other students, which embarrassed and distressed her. Her mother described Sydney as “mortified” when she first learned of the disclosure, screaming, yelling, crying, and gasping as she told her mother about it. Sydney told her mother that her friends had confronted her about the photos and that other students pointed, laughed, and made comments about her. She was “hysterical” because, as she said, her mother had taught her to respect police officers and she could not believe that “Mr. Doug” would “do that to [her]” instead of protect her. According to her mother, after Sydney found out about the dissemination, the defendant officer’s daughter chased Sydney *573 “every day around after school telling her her daddy was going to lose his job” if he were caught and begging Sydney not to tell her mother. In the morning on April 5, 2011, police officers came to Sydney’s house, and afterward Sydney was very upset about what sort of rumors and innuendos would result from that visit “because the pictures had already been seen and talked about.” At one point, Sydney repeated to her mother that the police had already shared the pictures, asking, “What more can they do to me?”
In a subsequent meeting with her coach, who pointed out Sydney’s assets, Sydney “started bawling” and listed some of her struggles, which included the dissemination of the pictures of her self-inflicted wounds. When her coach asked why she wanted to die, Sydney “just kind of went on a rampage” about her frustrations, which included gossiping girls “and those pictures going around.” After the meeting ended, Sydney spent time with her mother and friends that afternoon and early evening. That night around seven, she told her mother over the phone that she loved her, posted on her Facebook wall that she loved her best friends, wrote notes in odd places in her room, then went up to the attic of her family’s house and hanged herself.
The dissent says that 14-year-old Sydney was not in a rage, a frenzy, or acting under an uncontrollable impulse because the actions she took just before she killed herself showed she was acting voluntarily, and therefore the defendants are entitled to judgment as a matter of law. We cannot assume we know Sydney’s state of mind based on her outward actions. But regardless of our assumptions about her mental state, under a straightforward proximate cause and foreseeability analysis, genuine issues of material fact exist. A jury should decide whether Sydney’s suicide absolves the tortfeasor of any liability for her death based on his actions in sharing photographs of Sydney’s self-inflicted wounds with his daughter, Sydney’s classmate, photographs he took incident to his duties as a police officer.
For these reasons, I concur specially in Division 2.
I am hereby authorized to state that Judge McMillian joins in this special concurrence.

 See also La Quinta Inns v. Leech, 289 Ga. App. 812, 817 (1) (658 SE2d 637) (2008); Harvey v. Nichols, 260 Ga. App. 187, 193-194 (2) (581 SE2d 272) (2003); Kobeck v. Nabisco, 166 Ga. App. 652, 654 (3) (305 SE2d 183) (1983); and other cases cited infra in footnotes 15 and 16.

 See, e.g., Peterson v. Reeves, 315 Ga. App. 370, 372-378 (2), (3) (727 SE2d 171) (2012) (physical precedent only).

 See, e.g., Tucker v. Pearce, 332 Ga. App. 187, 191-193 (771 SE2d 495) (2015), cert. granted, Pearce v. Tucker, Case No. S15C1310 (Sept. 8, 2015).

 See, e.g., Brandvain v. Ridgeview Institute, 188 Ga. App. 106, 112-118 (372 SE2d 265) (1988).

 The plaintiffs in Stevens alleged that the defendants’ conduct rose to the level of a criminal conspiracy, and thus went beyond negligence; the plaintiff’s allegation of criminal conduct explains why the Supreme Court determined that the defendants could not have been guilty of the crime of murder. 140 Ga. at 686-687. The earliest wrongful death statutes allowed a plaintiff to recover damages only if the defendant had acted criminally; in 1887, the statute was amended to also encompass deaths caused by ordinary negligence. Thompson v. Watson, 186 Ga. 396, 409 (197 SE 774) (1938). See, e.g., McDonald v. The Eagle and Phenix Mfg. Co., 68 Ga. 839 (1882); Daly v. Stoddard, 66 Ga. 145 (1880).

 The court in Sneider denied summary judgment to a hotel in a suit to recover for the wrongful death of a woman who had jumped from the twenty-first floor to the lobby floor, after the hotel employees had received phone calls informing them of the woman’s suicidal tendencies.

 Not all of these cases involve special relationships. See Morris, 225 Ga. App. 186. Nor were special relationships present in La Quinta Inns, 289 Ga. App. 812, or Kobeck, 166 Ga. App. 652, and while these two cases cite Appling, they fail to note that Appling is not binding precedent. The point is that we have not applied Appling’s rigid framework to all tort cases involving suicide, despite protestations to the contrary. Our case law does not foreclose our ability to analyze this case using basic tort law principles of foreseeability.

 The notion that, unless suicide is committed in a frenzy, rage, or irresistible impulse, it is “voluntary” and therefore breaks the chain of causation reflects an outdated view of mental health. But the continued validity of Appling’s holding is a discussion for another day.