DILLARD, Judge,
concurring in part and dissenting in part.
I fully concur in Divisions 1, 3, 4, and 5 of the majority opinion. I respectfully dissent, however, from Division 2 because, as a matter of law, the undisputed evidence shows that Sahlberg’s wrongful conduct was not the proximate cause of Sanders’s death by suicide. Indeed, Maia may not recover for her wrongful-death and survival claims because, under well-established Georgia law, Sanders’s tragic suicide was an unforeseen intervening cause of her death, which absolves Sahlberg and the City from liability for such claims.
*574 As we have recently explained, from a legal point of view, proximate cause in this context means that the suicide “must have been a foreseeable result of the negligence of the tortfeasor.”[22] And, of course, negligence is not actionable unless it is “the proximate cause of the injury.”[23] Moreover, a wrongdoer is not responsible for a consequence which is “merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience.”[24] Further, as recognized by the majority, “fgjenerally, suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability!’[25] Nevertheless, there is an exception to this general rule: When the tortfeasor’s wrongful act causes the injured party to kill herself “during a rage or frenzy, or in response to an uncontrollable impulse, [it] is considered to be the proximate cause of the suicide.”[26] In addition, as discussed by the majority, we have also deviated from the general rule that suicide absolves an alleged tortfeasor of liability in cases involving custodial doctor-patient relationships when the patient’s suicide was alleged to have been the result of the doctor’s failure to adequately care for or protect the patient from self harm.[27] But because neither of these exceptions to our general rule regarding liability for suicide applies in this case, I would reverse the trial court’s denial of summary judgment to the defendants as to Maia’s wrongful-death and survival claims.
As to the first exception, there is no evidence to support a jury finding that Sanders killed herself during a rage or frenzy, or in response to an uncontrollable impulse, such that Sahlberg’s wrongful conduct, which occurred over a month before her death, may be *575 considered the proximate cause of her suicide. To be sure, at the end of the school day on the day of her suicide, Sanders confided to a teacher (and mentor) that she was extremely distraught and that the dissemination of the pictures of her injuries at school was one of several reasons she was upset. But there is no evidence that she was acting in a “rage” or a “frenzy” several hours later when she committed suicide. To the contrary, the evidence shows that, after the meeting with her teacher/mentor, Sanders sent a text message to that teacher indicating her desire to “change for the better,” which led her teacher to believe that Sanders was “on the upscale” because she seemed “excited and [like] she wanted to change.”
Sanders then spent time with friends after school, and several hours passed from 4:00 p.m. until 7:49 p.m., when she called her mother shortly before tragically taking her own life. During this phone call, Sanders said something to the effect of “I love you mama, I promise you I’m going to be all right, I’m going to read my Bible, I love you and I will see you when you get home.” According to Maia, nothing that Sanders said during the call alarmed her or caused her to be concerned that Sanders might harm herself. Thus, based on the foregoing evidence, even if Sanders’s behavior during the meeting with her teacher could possibly be characterized as a “rage” or “frenzy,” there is no evidence that Sanders was in a rage or had an uncontrollable impulse several hours later when she took her own life. As a result, the first exception to the general rule regarding liability for suicide does not apply in this case.[28]
Nevertheless, the majority likens the facts of this case to prior decisions involving the special relationship between a mental-healthcare provider and his patient in which we have held that whether the defendant’s deficient medical care was the proximate cause of the patient’s suicide was a jury question. But while this Court has previously held that the issue of proximate cause was a jury *576 question in that particular context,[29] we have neuer extended this exception to apply to any other context in which the defendant has no ability to make decisions regarding the victim’s mental healthcare, to supervise the victim, or to exercise control over the victim at the time of the suicide or negligent conduct. And I find no legal authority to support the majority’s decision to do so now.[30]
To support its position that the second exception (i. e., the “special-relationship exception”) to the general rule precluding liability for suicide applies in this case, the majority relies primarily on Purcell v. Breese[31] and Brandvain v. Ridgeview Inst., Inc.,[32] both of which involve the special relationship between a suicidal patient and his treating physician or other healthcare provider. In those cases, this Court held that suicide-based tort claims against doctors or medical institutions — asserting that negligent medical care of a patient resulted in the patient’s suicide — could be considered by a jury.[33] However, the defendants in those cases had specialized training in providing treatment to mentally-ill or suicidal patients, as well as the ability to make medical decisions or take actions regarding the patient’s physical safety while the patient was in their custody or under their *577 control. Suffice it to say, such circumstances are inapposite to the facts before us now.
Specifically, in Purcell, the evidence showed that, at the time when the defendant doctor discharged a patient (who later committed suicide) from a hospital, the patient was “at risk for committing suicide and had no intention of obtaining outpatient treatment.”[34] Under these particular circumstances, this Court held that the doctor’s decision to discharge the suicidal patient “without talking with him, seeing him or reviewing the most recent entries in his record created a reasonable apprehension of harm sufficient to withstand summary judgment.”[35] We further noted that, even though the doctor-patient relationship had been severed by the time of the suicide, the doctor could still be held liable because the alleged negligent acts occurred while the patient was in the doctor’s care at the time of his discharge.[36]
And in Brandvain, a patient, while he was living in a rehabilitation facility, used a shirt to hang himself after he was caught the previous day in a bathroom with one arm of his sweater around his neck and the other caught in the upper corner of the door.[37] The patient’s wife later sued his treating physician and the rehabilitation facility, asserting a wrongful-death claim, and the jury returned a verdict in her favor.[38] In upholding the jury’s verdict, this Court first noted that “[w]hile there is no duty to guarantee that a patient will not commit suicide, Georgia has long recognized a duty with regard to treatment of patients by doctors and other individual health care professionals as well as private hospitals . .. .”[39] And with regard to the doctor-patient relationship, this duty “extends to safeguarding and protecting the patient from any known or reasonably apprehended danger from himself which may be due to his mental incapacity, and to use ordinary and reasonable care to prevent it.”[40] As to proximate cause, we explained that the act of suicide is not a “per se legally supervening/intervening act,” hut instead, “[i]f the intervening criminal act is a reasonably foreseeable consequence of the defendant’s negligent conduct, the legal, causal connection between that conduct and injury is not broken.”[41] Then, after setting forth the
*578 foregoing legal authority, we summarily concluded that, under the evidence in that particular case, the question of proximate cause was one for the jury.[42]
But here, unlike in the doctor-patient context, Sahlberg was not a mental-healthcare professional with specialized training in treating suicidal individuals, and more significantly, Sanders was not in his custody or under his supervision at the time when she committed suicide.[43] And while the majority finds these distinctions of no consequence, I respectfully disagree. Assuming that the special-relationship exception applies to police officers and the citizens they serve, the only Georgia cases addressing the potential liability of law-enforcement officers for suicide involve inmates who committed ■suicide while they were physically in the alleged tortfeasor’s custody and under their supervision at the time of the suicide.[44] Moreover, even in those cases when law-enforcement officers do have a suicidal inmate in their custody and under their control at the time of the suicide, and as with Sahlberg, the officers violated police-department protocol in some respect, we have still held that the officers’ conduct was not the proximate cause of the inmate’s death as a matter of law.[45] Finally, it is worth noting that, while Georgia courts have *579 implicitly limited the special-relationship exception to custodial relationships in which the defendant has some ability to control the suicide victim’s conduct, such as exists in hospitals and prisons, other jurisdictions have recognized this limitation more explicitly.[46]
In sum, I acknowledge that Sahlberg’s flagrant violation of RHPD’s policy regarding confidentiality was undoubtedly wrongful and it may indeed have been a factor in Sanders’s tragic decision to take her own life. Nevertheless, even though questions of proximate cause ordinarily are reserved solely for the jury, Georgia courts have repeatedly held that, as a general matter of law, “suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability.”[47] And because no established exception to this general rule applies in this case, I would reverse the trial court’s denial of Sahlberg and the City’s motion for summary judgment on Maia’s wrongful-death and survival claims.
I am authorized to state that Judge Ray and Judge Peterson join in this dissent.

 Tucker v. Pearce, 332 Ga. App. 187, 191 (771 SE2d 495) (2015), cert, granted (Sept. 8, 2015) (punctuation omitted); accord Harvey v. Nichols, 260 Ga. App. 187,193 (2) (581SE2d272) (2003). The Supreme Court of Georgia granted certiorari in Tucker to consider whether this Court erred (1) by applying the “general rule” that suicide is an unforeseeable intervening cause of death, even though there was a special relationship between a detention officer and his prisoner, who committed suicide while in custody; and (2) in reversing the denial of the officer’s motion for summary judgment.

 Tucker, 332 Ga. App. at 191 (punctuation omitted); accord Harvey, 260 Ga. App. at 193 (2).

 Tucker, 332 Ga. App. at 191 (punctuation omitted) (emphasis supplied); accord Harvey, 260 Ga. App. at 193 (2).

 Tucker, 332 Ga. App. at 191 (punctuation omitted); accord La Quinta Inns, Inc. v. Leech, 289 Ga. App. 812, 816 (1) (658 SE2d 637) (2008); Harvey, 260 Ga. App. at 193 (2).

 Tucker, 332 Ga. App. at 191 (punctuation omitted); accord Harvey, 260 Ga. App. at 193 (2).

 See, e.g., Peterson v. Reeves, 315 Ga. App. 370, 375-78 (3) (727 SE2d 171) (2012) (physical precedent only); Purcell v. Breese, 250 Ga. App. 472, 475 (1) (552 SE2d 865) (2001); Brandvain v. Ridgeview Inst., Inc., 188 Ga. App. 106, 116 (3) (b) (372 SE2d 265) (1988); Misfeldt v. Hosp. Auth. of City of Marietta, 101 Ga. App. 579, 583-84 (115 SE2d 244) (1960).

 See Tucker, 332 Ga. App. at 191 (holding that an inmate’s suicide was an unforeseeable intervening act for which a detention officer was not liable when, inter alia, there was no evidence that the inmate was in a rage or frenzy or had an uncontrollable impulse at the time when he took his own life, but was instead calm and controlled and appeared to have known what he was doing); Harvey, 260 Ga. App. at 194 (2) (holding that the exception to the general rule regarding proximate cause and suicide did not apply when there was no evidence that an inmate was in a rage or frenzy or had an uncontrollable impulse at the time when he killed himself and when the inmate appeared calm, controlled, and appeared to know what he was doing); Dry Storage Corp. v. Piscopo, 249 Ga. App. 898, 900 (550 SE2d 419) (2001) (holding that a suicide victim did not kill himself during a rage or frenzy or in response to an uncontrollable impulse when, although his physical or psychological pain was obvious and he specifically attributed it to the alleged tortfeasor’s negligence, he recorded a videotape just before he committed suicide in which he appeared to have control of himself and to have known exactly what he was doing).

 See supra footnote 27.

 Although the special concurrence acknowledges the analytical framework applied in Georgia suicide cases for the past 50 years (i.e., that suicide is generally an unforeseeable intervening cause of death unless either the rage-or-frenzy or special-relationship exception applies), it would nonetheless depart from that well-settled framework and apply “a straightforward application of the tort concept of foreseeability.” Maj. op. at 569. In support of this position, the special concurrence relies on the Supreme Court of Georgia’s decision in Stevens v. Steadman, 140 Ga. 680 (79 SE 564) (1913), which is not at all inconsistent with our current rule that, generally, suicide is an unforeseeable intervening cause of death in tort cases. Indeed, the Stevens Court ultimately held that the alleged tortfeasors could not be held liable for the plaintiff’s husband’s suicide, which allegedly resulted from their actions, regardless of how reprehensible those actions might he. See Stevens, 140 Ga. at 686-687. In addition to Stevens, the special concurrence relies on two federal cases, which, unlike the numerous Georgia cases cited in this dissent, are not binding precedents. The special concurrence then goes on to identify several Georgia cases, which it contends do not address the issue of suicide “through the framework of special relationships or whether the deceased acted in a rage or frenzy or due to an uncontrollable impulse.” But all of the decisions relied upon by the special concurrence, holding (or arguably holding) that the suicides in question were not unforeseeable as a matter of law, involved a custodial or doctor-patient relationship between the deceased and the alleged tortfeasor. These cases, then, are perfectly consistent with our jurisprudence on civil liability for suicide (as outlined in this dissent). Indeed, even if not explicitly set forth in every opinion, the cases identified by the special concurrence have not departed from our general rule that suicide is not foreseeable as a matter of law, unless one of the aforementioned exceptions applies. To infer otherwise from cases where this Court has been less than precise in applying the well-established analytical framework for suicide cases seriously undermines the doctrine of stare decisis as it applies to this particular line of jurisprudence.

 250 Ga. App. 472 (552 SE2d 865) (2001).

 188 Ga. App. 106 (372 SE2d 265) (1988).

 See Purcell, 250 Ga. App. at 475 (1); Brandvain, 188 Ga. App. at 116 (3) (b).

 Purcell, 250 Ga. App. at 475 (1).

 Id.

 See id. at 475-76 (2).

 See Brandvain, 188 Ga. App. at 109-10.

 See id. at 111.

 See id. at 112 (2).

 Id. at 112-13 (2).

 Id. at 116 (3) (b) (punctuation omitted).

 See id.

 Cf. Bradley Ctr., Inc. v. Wessner, 250 Ga. 199, 200-01 (1) (296 SE2d 693) (1982) (holding that defendant medical center, which allowed a patient, who “would likely cause bodily harm to his wife if he had the opportunity,” to leave the center for a weekend could be liable for the patient’s actions of killing his wife and her “paramour” during that weekend because, inter alia, when “the course of treatment of a mental patient involves an exercise of ‘control’ over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient” (punctuation omitted) (emphasis supplied)); Peterson, 315 Ga. App. at 375-78 (3) (holding, in a medical-malpractice case in which the plaintiff sought to recover for injuries sustained in an attempted suicide, that whether the doctor’s failure to provide the requisite standard of care in several respects, including his failure to involuntarily commit the plaintiff, was the proximate cause of her injuries could be decided by a jury); but see Miranda v. Fulton DeKalb Hosp. Auth., 284 Ga. App. 203, 207-08 (2) (644 SE2d 164) (2007) (holding, in a medical-malpractice case, that defendant hospital and physicians’ failure to sufficiently monitor a suicidal patient who slipped out of restraints, left the hospital, and committed suicide the next day was not the proximate cause of the patient’s death as a matter of law).

 See infra footnote 46. Notably, although the majority likens the doctor-patient relationship to the duty of care that a police officer owes to the general public, it does not discuss any of the “prison cases” that specifically address potential liability of police officers for suicide. Regardless, neither line of jurisprudence applies here because, unlike in both the hospital and prison contexts, Sanders was never in Sahlberg’s custody or under his supervision or control.

 See Tucker, 332 Ga. App. at 190, 192-93 (holding that a detention officer’s alleged negligent conduct of failing to medically screen an inmate, who later committed suicide in a holding cell — in violation of the police department’s policies — was not the proximate cause of the inmate’s death when there was no evidence that the inmate would have been unable to kill himself if he had been medically screened, and any claim that the inmate would have presented *579 as suicidal in such screening was purely speculative); Harvey, 260 Ga. App. at 193-94 (2) (holding that two detention officers’ failure to follow their police department’s protocol to regularly monitor holding cells was not the proximate cause of the inmate’s death when there was no evidence that the inmate would have been unable to take his life if surveillance protocol had been followed and any suggestion that the suicide attempt would have been unsuccessful if it had been followed was pure speculation).

 See Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 728 (I) (972 A2d 1050) (2009) (noting, as to the special-relationship exception, that a duty of care to prevent suicide has been imposed on “(1) institutions such as jails, hospitals and reform schools, having actual physical custody of and control over persons; and (2) persons or institutions such as mental hospitals, psychiatrists and other mental-health trained professionals, deemed to have a special training and expertise enabling them to detect mental illness and/or the potential for suicide, and which have the power or control necessary to prevent that suicide” (punctuation omitted)); Gilmore v. Shell Oil Co., 613 So2d 1272, 1276 (Ala. 1993) (noting that the “duty to prevent” exception to the general rule that suicide exonerates a defendant from legal responsibility applies only in a “custodial situation . . . typically in the case of hospitals or prisons” (punctuation omitted) (emphasis supplied)); Krieg v. Massey, 239 Mont. 469, 473 (781 P2d 277) (1989) (same); see also Aguila v. Hilton, Inc., 878 So2d 392, 399 (Fla. Dist. Ct. App. 2004) (“[Ijimplicit in the special[-]relationship exception is the proposition that the special relationship must include the right or the ability to control another’s conduct.” (emphasis and punctuation omitted)).

 Tucker, 332 Ga. App. at 191 (punctuation omitted); accord La Quinta Inns, Inc., 289 Ga. App. at 816 (1); Harvey, 260 Ga. App. at 193 (2); Dry Storage Corp., 249 Ga. App. at 899.