A03A0568. HARVEY et al. v. NICHOLS et al.
(581 SE2d 272)

BLACKBURN, Presiding Judge.

In this action for the wrongful death of a prison inmate, Patricia L. Harvey, individually, as next friend, and as representative of the estate of Thomas Alan Reagin, and Thomas Keith Reagin, individually and as next friend of Thomas Alan Reagin ("appellants") appeal the trial court's grant of summary judgment to appellees Joe Nichols, Sheriff of Newton County, Leroy Blondeau, manager of the Newton County Jail, and Steven Ledford and George Gregory Gardner, Newton County detention officers, arguing that the trial court erred as a matter of law in: (1) finding that the appellees acted in the performance of discretionary functions; (2) finding no evidence that the appellees acted with actual malice or an intent to cause injury to the deceased; (3) finding that there was no justiciable issue of causation;

and (4) not finding a material issue of fact with regard to the credibility of the witnesses and the weight of the evidence in the light of impeachment. For the reasons set forth below, we affirm.

The record shows that on the night of October 21, 1998, Lieutenant Marty Roberts of the Newton County Sheriff's Office informed Detective Ezell Brown that he had been contacted by agents of the Georgia Bureau of Investigation about the murder earlier in the day of a woman in Jasper County. The agents indicated that a suspect from Newton County had been among the last people to be seen with her and requested that Brown and Roberts assist them in going to the suspect's residence.

Brown, Roberts, and the GBI agents went to the location in question and found Thomas Alan Reagin, appellants' decedent, and his grandfather inside a camper on the property. The officers asked Reagin and his grandfather to come to the sheriff's office for questioning, and the two readily agreed to do so.

Reagin and his grandfather arrived at the sheriff's office shortly after midnight. Brown testified that Reagin, who was 17 years of age, appeared fine; that he was easygoing and cooperative; and that he "showed no real concern at the moment."

Reagin's grandfather was taken to an interview room by the GBI and county officers. He was given his *Miranda* rights, waived his right to an attorney, and denied any participation in the murder.

The officers took Reagin to the interview room. After being given his *Miranda* rights and waiving his right to an attorney, Reagin, without emotion or remorse, admitted to murdering the woman at his grandfather's direction.

During Reagin's booking at approximately 6:00 a.m., Officer Kimbrell asked Reagin if he had a history of psychiatric problems, and Reagin told him that as a boy he had had some problems and been through anger management. Because of the past treatment, Kimbrell circled the phrase "psychiatric problems" on the intake form. By circling this phrase, Kimbrell called Reagin's history to the attention of the nurse at the jail.

Kimbrell testified that at the time he was booked, Reagin did not appear to be a danger either to himself or others, and that he gave no indication of unusual behavior. However, because of Reagin's age and the seriousness of the crime with which he was charged, Kimbrell wrote on the intake form that Reagin should be placed in an observation cell "due to high risk." After filling out the form, Kimbrell took Reagin to the observation cell. Reagin spent most of the day either talking with investigators or in the observation cell.

Captain Blondeau, as manager of the jail, was responsible for reviewing Reagin's cell placement and changing the assignment if appropriate. In reviewing the placement, Blondeau and Sergeant

Phillip Jackson spoke with Reagin for 30 to 45 minutes. When Blondeau asked Reagin if he would be all right in the general population with the other inmates, Reagin said he might "hurt somebody."

Blondeau testified that Reagin showed no embarrassment at his guilt but was, instead, calm and outgoing, even joking with Blondeau about the homicide, behavior which Blondeau found not at all characteristic, based on his experience, of one contemplating suicide. Jackson also testified that when he and Blondeau talked with Reagin, Reagin did not appear suicidal or give him any reason to believe that he should be placed on a suicide watch.

After talking at length with Reagin, Blondeau spoke with Detective Brown about his impressions of Reagin; he also reviewed the nurse's notes in Reagin's file. Based on these interviews and notes, Blondeau decided not to place Reagin in the general population but to move him from the observation cell, which did not have facilities and which was already housing a known suicide risk, to Holding Cell 3 (HC-3). Blondeau testified that he decided to move Reagin to HC-3 because of Reagin's age, the nature of his offense, Reagin's statement that he might hurt somebody, and Blondeau's own concern that it would be Reagin, not another inmate, who might be hurt.

Detention Officers Ledford and Gardner came on duty at 3:30 p.m. Reagin was moved to HC-3 by Gardner about 4:00 p.m. Shortly thereafter, both Blondeau and Jackson left for the day without any further contact with Reagin.

Gardner checked on Reagin around 4:45 p.m. At that time, Reagin said he was ready to go into the general population, but Gardner told Reagin that he was busy and would have to get back to him. Both Ledford and Gardner testified that they took Reagin his dinner, but the evidence was conflicting as to whether this was done at approximately 5:30 p.m. or 7:30 p.m. Ledford also testified that he checked on Reagin between 8:00 and 8:15 p.m., but no entry was made in the log book.

Brown and Roberts decided that they should request a DNA sample from Reagin, and Ledford was sent to bring Reagin from his cell. When Ledford opened Reagin's cell at 9:13 p.m., he found Reagin hanging by a bedsheet from a heating grate. Reagin had turned purple, he was stiff and cold to the touch, and blood had already pooled in his feet.

Appellants filed suit against the appellees, as well as two other police officers and the Newton County Board of Commissioners (collectively the "defendants"), in federal district court pursuant to 42 USC § 1983, alleging that the defendants acted with deliberate indifference to the medical needs and personal safety of their son, in violation of the Eighth and Fourteenth Amendments, when they failed to prevent his suicide. Appellants also asserted various state law

claims. The U. S. district court granted summary judgment to the defendants on the appellants' federal claims, finding that the defendants were protected by qualified immunity and that the appellants failed to show that the failure of the jail employees to identify a potentially suicidal detainee and their subsequent failure to take the necessary precautions violated the Eighth and Fourteenth Amendments. The federal court refused to exercise supplemental jurisdiction over the appellants' state law claims.

Appellants filed an action on the state law claims in the superior court. The appellees filed a motion for summary judgment, and the superior court granted the motion, finding that: sovereign immunity barred the appellants' claims against each of the appellees in his official capacity; official immunity barred prosecution against each of the appellees in his individual capacity because each was performing a discretionary function and had not acted with the requisite actual malice or intent to cause injury to the deceased; and there was no justiciable issue of causation.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

*Matjoulis v. Integon Gen. Ins. Corp.*[1]

1. In two enumerations of error, the appellants argue that the trial court erred: in finding that the appellees were performing discretionary functions, and were thus protected by official immunity unless they acted with actual malice or intent to cause injury; and in also finding no evidence that the appellees acted with actual malice or an intent to cause injury to the deceased.

> The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity. Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

negligently performed or acts performed with malice or an intent to injure.

(Punctuation and footnotes omitted.) *Cameron v. Lang.*[2]

> Employees of a county sheriff's department are immune from liability for negligent acts that are discretionary rather than ministerial. A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed. Whether a duty is ministerial or discretionary turns on the character of the specific act, not the general nature of the official's position.

(Citations and punctuation omitted.) *Schmidt v. Adams.*[3]

(a) *Sheriff Nichols and Captain Blondeau.* We agree with the trial court that the acts of Sheriff Nichols and Captain Blondeau of which appellants complain were discretionary ones. Nichols was not involved in the arrest, interrogation, booking, or placement of Reagin; he was briefed by other officers on the case on the evening of October 22 before he left work and had no other contact with the jail until he was notified that night that Reagin had hanged himself. The appellants, however, maintain that Nichols was negligent in carrying out his responsibilities with respect to the operation of the jail, the supervision of its officers and employees, and the establishment of policies and procedures.

Any decisions with regard to these responsibilities "clearly would be made by [Nichols] based on his examination of the facts, his experience, and the exercise of his best judgment. The acts complained of are thus 'discretionary' and fall within the scope of [Nichols's] official immunity." *Schmidt*, supra at 157. Moreover, this Court has consistently held that the operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function as opposed to a ministerial, proprietary, or administratively routine function. See *Carter v. Glenn*;[4] *Bontwell v. Dept. of Corrections*;[5] *McDay v. City of Atlanta.*[6]

---

[2] *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001).

[3] *Schmidt v. Adams*, 211 Ga. App. 156-157 (438 SE2d 659) (1993).

[4] *Carter v. Glenn*, 249 Ga. App. 414, 417 (2) (548 SE2d 110) (2001).

[5] *Bontwell v. Dept. of Corrections*, 226 Ga. App. 524, 527-528 (4) (486 SE2d 917) (1997).

[6] *McDay v. City of Atlanta*, 204 Ga. App. 621 (1) (420 SE2d 75) (1992).

It is equally clear that Captain Blondeau's actions in dealing with Reagin were discretionary in nature. Blondeau, as jail manager, had the responsibility for reviewing Reagin's cell placement. His decision to place Reagin in HC-3 was made only after he talked with Reagin himself, reviewed the notes in Reagin's file, and discussed the matter with Detective Brown and Sergeant Jackson. He also stated that he made the decision to move Reagin to a holding cell rather than into the general population because of concerns about Reagin's age and safety and the nature of the crime with which he was charged. His actions, made on the basis of his examination of the facts, his experience, and the exercise of his best judgment, were discretionary.

Finally, there is no basis for finding that either Nichols or Blondeau acted with actual malice or an actual intent to harm Reagin. "In general a malicious act involves all that is usually understood by the term 'wilful,' and is further marked by either hatred or ill will or by such utter recklessness and disregard of the rights of others as denotes a corrupt or malevolent disposition." (Punctuation omitted.) *Partain v. Maddox*.[7] "The phrase 'actual intent to cause injury' has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." (Citation and punctuation omitted.) *Kidd v. Coates*.[8]

Nothing the appellants charged either Nichols or Blondeau with doing or failing to do rises to the level of actual malice or evidences an actual intent to harm. The trial court did not err in granting summary judgment to Nichols and Blondeau.

(b) *Officers Ledford and Gardner.* Though we agree with the trial court's analysis of the liability of Nichols and Blondeau, we cannot agree with its determination that the actions of Officers Ledford and Gardner were discretionary. The Newton County Jail had established policies and procedures which governed the surveillance of inmates. All prisoners were to be observed on a regular basis, the frequency of observation depending on whether the prisoner was housed in an observation cell, a holding cell, or the general population. "While the act of establishing a policy in the first place is discretionary, the acts of following established policies of inspecting and monitoring are ministerial tasks." *Carter*, supra at 417. The actions of Ledford and Gardner, dictated as they were by established procedure and requir-

---

[7] *Partain v. Maddox*, 131 Ga. App. 778, 783-784 (1) (206 SE2d 618) (1974).
[8] *Kidd v. Coates*, 271 Ga. 33 (518 SE2d 124) (1999).

ing merely the execution of a specific duty, were ministerial in nature.

Beyond this, while Ledford and Gardner testified that Reagin was checked on with a regularity which might have satisfied jail procedures, there was evidence which contradicted this testimony. Viewing the evidence and all reasonable inferences therefrom in a light most favorable to the nonmovants, Ledford and Gardner did not observe Reagin on a regular basis and were thus negligent in performing their duties. Accordingly, the trial court erred in granting summary judgment to Ledford and Gardner on official immunity grounds.

2. In their third enumeration of error, appellants contend the trial court erred in holding that there was no justiciable issue of causation because Reagin's suicide was an unforeseeable and intervening cause of death. We disagree.

The question before us is whether the officers' failure to monitor Reagin on a regular basis was the proximate cause of Reagin's suicide or whether the suicide was an unforeseeable act that was not caused by the officers' failure to conduct regular surveillance.

> [F]rom a legal point of view, proximate cause means that the suicide must have been a foreseeable result of the negligence of the tortfeasor. Negligence is not actionable unless it is the proximate cause of the injury. A wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. Generally, suicide is an unforeseeable intervening cause of death which absolves the tortfeasor of liability. Although, there is an exception to this general rule: Where the tortfeasor's wrongful act causes the injured party to kill himself during a rage or frenzy, or in response to an uncontrollable impulse, the wrongful act is considered to be the proximate cause of the suicide.

(Punctuation and footnotes omitted.) *Dry Storage Corp. v. Piscopo.*[9]

In this case, there was no evidence that Reagin's suicide was a probable consequence of the detention officers' failure to monitor his cell. All of the jail personnel who encountered Reagin testified that he acted in a normal fashion, was outgoing and under control, and readily spoke with the officers. Nothing about his behavior suggested anything out of the ordinary or that he might be a danger to himself. Reagin was not placed on suicide watch. Nothing in the record before

---

[9] *Dry Storage Corp. v. Piscopo*, 249 Ga. App. 898, 900 (550 SE2d 419) (2001).

this Court suggests that, if the surveillance protocol had been followed, Reagin would not have been able to take his own life. Any assertion that Reagin's attempt at suicide would have been unsuccessful if procedure had been followed is pure speculation.

The exception to the general rule regarding proximate cause and suicide does not apply. There is no evidence that Reagin was in a rage or frenzy or had an uncontrollable impulse when he took his life. On the contrary, Reagin was calm and controlled and appears to have known what he was doing. *Piscopo*, supra at 900.

Appellants point to the testimony of Louise White, an officer at the jail, as evidence that the appellees should have been aware that Reagin was suicidal. White testified that when she arrived at the jail for her shift, she asked Blondeau and Jackson if Reagin had been placed on a suicide watch. White stated that she was surprised when Blondeau informed her that Reagin had not been placed on suicide watch. White also testified, however, that she had no contact with Reagin while he was alive and had heard about him and the crime of which he was accused on the news. When asked why she was surprised that Reagin was not on suicide watch, she stated,

> Because of the nature of the crime they were charged with and this was a young boy, just turned seventeen, to my knowledge. And this is just my own personal feeling that someone of that age having committed this type of crime, they had to be going through something emotionally and I just felt myself that he should have been in observation.

White's assessment of Reagin's mental state was baseless speculation. Such uninformed "speculation which raise[s] merely a conjecture or possibility [is] not sufficient to create even an inference of fact for consideration on summary judgment." *Brown v. Amerson.*[10]

We conclude, as a matter of law, that the failure of Officers Ledford and Gardner to observe Reagin on a regular basis was not the proximate cause of Reagin's taking his own life. Accordingly, though the trial court erred in granting summary judgment to Ledford and Gardner on the grounds that they were protected by official immunity, we hold that the suicide was an unforeseeable intervening act for which the officers are not liable. *Brown*, supra. "A summary judgment right for any reason will be affirmed." *Kaylor v. Atwell.*[11]

3. Appellants' remaining enumeration of error is without merit.

*Judgment affirmed. Ellington and Phipps, JJ., concur.*

---

[10] *Brown v. Amerson*, 220 Ga. App. 318, 320 (469 SE2d 723) (1996).
[11] *Kaylor v. Atwell*, 251 Ga. App. 270, 272 (2) (553 SE2d 868) (2001).

Decided February 27, 2003 —
Reconsideration denied March 12, 2003 — 

*Lander & Osborne, Kenneth J. Lander, Donald W. Osborne,* for appellants.

*Cook, Noell, Tolley, Bates & Michael, Edward D. Tolley, Robert C. Irwin III, William T. Craig,* for appellees.