**FIFTH DIVISION**
**RICKMAN, C. J.,**
**McFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 11, 2022**

# In the Court of Appeals of Georgia

A21A1251. BRANTLEY et al. v. JONES et al.

A21A1252. BRANTLEY et al. v. CITY OF HIRAM et al.

McFADDEN, Presiding Judge.

On May 10, 2017, City of Hiram police officer Jennifer Darr arrested Lisa Michelle Ariail for driving under the influence and took her to the Paulding County jail for holding. While there, Ariail committed suicide. Ariail's daughter, Kelsie Brantley, filed this action both in her individual capacity and as the administrator of Ariail's estate, asserting a negligence claim against the City of Hiram and Darr, in her individual and official capacities, and against Paulding County and five detention officers employed by the Paulding County Sheriff's Office — Andrew Jones, Kallie

Capes, Vida Davis, Kaitlyn Richardson, and Michael Hannah ("the detention officers" or "the officers") — in their individual and official capacities.[1]

In these related appeals, Brantley challenges the trial court's orders granting summary judgment to the City of Hiram and Darr (Case No. A21A1252) and granting summary judgment to the five detention officers (Case No. A21A1251). (Earlier in the litigation, the trial court granted judgment on the pleadings to Paulding County, and Brantley does not enumerate that ruling as error.[2])

As detailed below, we affirm the grant of summary judgment to the City of Hiram and to Darr in Case No. A21A1252, because sovereign immunity and official immunity, respectively, bar Brantley's action against them.

We also affirm in part the grant of summary judgment to the detention officers in Case No. A21A1251 to the extent that Brantley's action against them is based on

---

[1] Brantley also asserted negligence claims against the City of Hiram Police Department and the Paulding County Sheriff's Office, but those are not separate legal entities capable of being sued. See *McClain v. City of Carrollton Police Dept.*, 361 Ga. App. 496, 498 (1) (863 SE2d 172) (2021) (holding that a city police department is not a legal entity that can be sued); cf. *Seibert v. Alexander*, 351 Ga. App. 446, 448 (1) (829 SE2d 473) (2019) (adopting persuasive federal authority that, in Georgia, a sheriff's office is not a legal entity that can be sued).

[2] The trial court also granted judgment on the pleadings to the Paulding County Sheriff's Office.

alleged negligence *other than* the officers' violation of a duty to check on Ariail every 15 minutes. We affirm because the trial court held that official immunity barred any such claims and Brantley has not enumerated that ruling at error.

But we reverse the grant of summary judgment to the detention officers in Case No. A21A1251 to the extent that Brantley's action against them is based on their alleged negligence in failing to follow a procedure requiring them to check on Ariail every 15 minutes. The trial court correctly found that the officers are not entitled to official immunity as to this claim because it involves a ministerial act. But, contrary to the trial court's conclusion, there exist genuine issues of material fact as to causation that preclude summary judgment. And we are not persuaded by the officers' arguments that we should affirm the grant of summary judgment as right for any other reason.

1. *Facts and procedural history.*

We construe the facts in favor of Brantley, the nonmovant on summary judgment. See *Gatto v. City of Statesboro*, 353 Ga. App. 178 (834 SE2d 623) (2019). So viewed, the evidence shows the following.

Early in the morning of May 10, 2017, Darr stopped Ariail for a traffic infraction and ultimately arrested her for driving under the influence of both alcohol

3

and medications. During the stop, Ariail told Darr that she took medication for depression.

Darr took Ariail to the Paulding County jail, arriving there shortly before 5 a.m. Detention officers Davis, Jones, and Capes were on duty at that time. Darr informed officers at the jail that Ariail was impaired and that she suspected Ariail had been mixing alcohol and medications, and she gave the officers a citation charging Ariail with driving under the influence of a combination of drugs and alcohol.

At the jail, Darr completed a medical screening form with input from Ariail. Darr was required to complete that form fully and accurately. Davis, as the shift supervisor on duty at that time, was responsible for determining whether Ariail could be booked into the jail, and she signed off of the medical screening form that Darr had completed.

Among other things, the medical screening form asked: "[H]as the arrestee demonstrated any behaviors that might suggest mental illness?" Darr replied "no" to this question. Ariail did not appear to Darr to have a mental illness. Moreover, Darr expressly asked Ariail if she had a mental illness, and Ariail responded that she did not. But Darr did not tell the detention officers that Ariail was taking medication for

4

depression. Darr testified that she did not believe that the fact that a person took medication for depression necessarily meant that the person had a mental illness.

The medical screening form also asked: "[H]as the arrestee demonstrated any behavior that might suggest suicidal tendencies?" Darr replied "no" to this question as well. Ariail had not given Darr any indication that she was suicidal and, when Darr expressly asked Ariail if she had suicidal tendencies, Ariail responded that she did not.

Ariail, however, had a history of suicide attempts, and information about those attempts was in records accessible to the detention officers. The detention officers did not search those records for prior mental health or suicide alerts related to Ariail when she was brought to the jail. The detention officers also did not book Ariail into the jail when she arrived. Had they done so, they would have conducted their own medical observation and suicide screening of Ariail.

Instead, Capes searched Ariail and had her change into a jumpsuit, permitting Ariail (at Ariail's request) to keep her tank top, and then she and Jones placed Ariail in a holding cell. During this process, Ariail was intoxicated and smelled of alcohol, and she was emotional and acting belligerently. Ariail was alone in the holding cell.

Ariail was placed in the holding cell rather than booked into the jail so that she could become sober. This was in accordance with the jail's normal practice of putting heavily intoxicated persons in a holding cell for up to eight hours so that they could become sober before initiating the booking process.

The detention officers are all responsible for knowing the jail's policies and procedures. One of the jail's written procedures provided in part that "[i]nmates who are suicidal, assaultive, escape risks, mentally/emotionally disordered, *or recovering from intoxicants* shall receive in-person surveillance of at least every 15 minutes" (hereinafter, the "15-minute watch procedure"). (Emphasis supplied.) This procedure served the jail's written policy that, "[t]o ensure the safety and security of inmates and the facility, inmates in the Paulding County Sheriff's Office Adult Detention facility are provided direct in-person surveillance on a routine basis." During a 15-minute watch, a detention officer must actually see the detainee. But at the time of Ariail's death, the jail had no written procedure for how to inform the officers that a detainee was subject to a 15-minute watch.

Shift supervisor Davis agreed in her deposition that a detainee who has been placed in a holding cell to "sober up" for booking is "recovering from intoxicants." But Ariail was not placed on a 15-minute watch.

A shift change occurred at 5:30 a. m.; officers Davis, Jones, and Capes finished their shifts and officers Hannah and Richardson began their shifts. At that point, Ariail was still in the holding cell and had not been booked into the jail. Between 5:30 and 6 a.m., Ariail could be heard screaming from within the cell. No detention officers responded to the screaming, and Ariail stopped screaming around 6 a.m.

Officer Hannah was responsible for checking on Ariail. He was still in training and had a history of not adequately performing surveillance duties and of improperly changing information on the watch logs. Hannah did not make visual contact with Ariail every 15 minutes, as would be required for a 15-minute watch. Instead, five times during his shift Hannah looked through a window flap that provided a view of most of the cell but not the portion where the toilet was located, which was behind a metal privacy partition. And he did not make visual contact with Ariail each of those five times. The last time Hannah actually saw Ariail was between 6:36 and 6:45 a. m. At approximately 6:42 a. m., Hannah began distributing breakfast trays to detainees, but he did not give one to Ariail because he did not see her in the holding cell. He also did not see Ariail when he looked in the cell again at 7:30 a.m.

At 8:04 a.m., an officer entered the holding cell and found Ariail hanging by the neck from her tank top, which was tied to the metal privacy partition in the cell. Ariail was dead and her body was bluish in color.

2. *Claims against the City of Hiram and Darr (Case No. A21A1252).*

The trial court granted summary judgment to Darr on the ground that she was entitled to official immunity from suit, and he granted summary judgment to the city on the ground that, due to Darr's immunity, the city could not be liable for her actions under a theory of respondeat superior. The city also had argued to the trial court that it was itself immune from suit, and although the trial court did not expressly address that argument in his order, we may consider that theory in reviewing the summary judgment ruling. See *Hardin v. Hardin*, 301 Ga. 532, 537 (801 SE2d 774) (2017) ("Appellate courts . . . retain discretion to apply the 'right for any reason' rule on de novo review and consider alternative legal theories or analysis not relied on by the trial court on summary judgment.").

Brantley makes three arguments on appeal: that Darr was not entitled to official immunity because her act of filling out the medical screening form was ministerial rather than discretionary; that the city waived its immunity from suit to the extent of its liability insurance; and that Brantley should be allowed to proceed with her

8

derivative claims for punitive damages and attorney fees. As detailed below, we are not persuaded by these arguments. So we affirm the grant of summary judgment to the City and Darr.

(a) *Claims against Darr in her individual capacity.*

The trial court correctly held that Brantley's claims against Darr in her individual capacity cannot proceed because they are barred by official immunity. "The doctrine of official immunity, also known as qualified immunity, protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption." *McDowell v. Smith*, 285 Ga. 592, 593 (678 SE2d 922) (2009) (citation and punctuation omitted). See also Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d). "Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure." *Grammens v. Dollar*, 287 Ga. 618, 619 (697 SE2d 775) (2010) (citation omitted). Brantley does not argue that Darr had malice or an intent to injure.

Whether a public officer's act is ministerial or discretionary is a fact-specific question. See *Grammens*, 287 Ga. at 620. As our Supreme Court has explained,

[a] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

Id. at 619 (citation omitted).

Brantley argues that Darr's act of filling out the medical screening form was ministerial, because she had reason to know that Ariail was depressed and the city's policies and procedures "required her to associate depression with mental illness, to write this information in her report, and to check 'yes' for 'mental illness' in the medical screen report."

It is true that the act of following established policies and procedures can be ministerial. See *Carter v. Glenn*, 249 Ga. App. 414, 417 (2) (548 SE2d 110) (2001). But to impose a ministerial duty, a policy or procedure "must mandate simple, absolute, and definite action and require the execution of a specific task without any exercise of discretion." *Grammens*, 287 Ga. at 620. See also *Daley v. Clark*, 282 Ga. App. 235, 245 (2) (a) (638 SE2d 376) (2006) ("procedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite, and certain as

10

merely to require the execution of a relatively simple, specific duty") (citation and punctuation omitted).

The medical screening form required Darr "to decide whether the condition that was the necessary prerequisite to the ministerial act existed[,]" *Grammens*, 287 Ga. at 620, by determining whether Ariail had demonstrated mental illness. But because the form "did not define the term [mental illness, it] required [Darr] to engage in a discretionary act, i. e., to exercise personal deliberation and judgment by examining the facts and reach a reasoned conclusion with regard to the applicability of the dictates of the [form]." *Grammens*, 287 Ga. at 620-621. And because Darr had to exercise discretion in filling out the form, her act of completing it did not require her to perform a ministerial duty. See id. at 621. See also *Pearce v. Tucker*, 299 Ga. 224, 228 (787 SE2d 749) (2016) (rejecting argument that an officer had a ministerial duty to include a detainee's suicidal ideation on a medical screening form, noting that while the applicable policy "dictates what health information should be gleaned from a detainee, it provides no guidance on how such a 'medical screening' might be conducted"). So "the trial court correctly ruled that official immunity shielded [Darr] from personal liability." *Grammens*, 287 Ga. at 621. Accord *Pearce*, 299 Ga. at 228-229.

11

(b) *Claims against the city and against Darr in her official capacity.*

"The Georgia Constitution provides municipalities performing their governmental functions with immunity from civil liability, which only the General Assembly (or the Constitution itself) may waive." *Atlantic Specialty Ins. Co. v. City of College Park*, __ Ga. __, __ (2) (__ SE2d __) (Case No. S21G0482, decided Feb. 15, 2022). This immunity also extends to the actions of Darr in her official capacity. See *City of Atlanta v. Mitcham*, 296 Ga. 576, 583 (3) (769 SE2d 320) (2015).

Brantley argues that immunity does not bar her claims against the city (or, presumably, Darr in her official capacity) because the city waived its immunity by purchasing liability insurance. We disagree.

"In OCGA § 36-33-1 (a), the General Assembly reiterated that sovereign immunity for municipalities is the [s]tate's public policy, while also expressly providing several narrow waivers[.]" *Atlantic Specialty Ins. Co.*, __ Ga. at __ (2). That Code section provides:

> (a) Pursuant to Article IX, Section II, Paragraph IX of the Constitution of the State of Georgia, the General Assembly, except as provided in this Code section and in Chapter 92 of this title, declares it is the public policy of the State of Georgia that there is no waiver of the sovereign immunity of municipal corporations of the state and such municipal corporations shall be immune from liability for damages. *A municipal*

12

*corporation shall not waive its immunity by the purchase of liability insurance, except as provided in Code Section 33-24-51 or 36-92-2, or unless the policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy.* This subsection shall not be construed to affect any litigation pending on July 1, 1986.

OCGA § 36-33-1 (a) (emphasis supplied).

The facts of this case do not implicate either OCGA § 33-24-51 or OCGA § 36-92-2, which concern claims for the negligent use of a covered motor vehicle. And Brantley has pointed to no evidence showing that the city has an insurance policy that covers the acts upon which she bases her negligence claim. See generally *Dept. of Transp. v. Mixon*, 312 Ga. 548, 550 (2) (a) (864 SE2d 67) (2021) ("The burden of demonstrating a waiver of sovereign immunity rests upon the party asserting it.") (citation and punctuation omitted). So Brantley's argument regarding liability insurance lacks merit.

We note that the city argues it cannot be held liable under OCGA § 36-33-3, which provides that "[a] municipal corporation shall not be liable for the torts of policemen or other officers engaged in the discharge of the duties imposed on them by law." Specifically, the city argues that OCGA § 36-33-3 is not an immunity

statute, but see *Ekarika v. City of East Point*, 204 Ga. App. 731, 733 (420 SE2d 391) (1992) (holding that OCGA § 36-33-3 is a "governmental immunity statute"), and therefore the shield from liability established by that statute is not subject to waiver. Given our conclusion that sovereign immunity bars the claims against the city, we do not address its argument regarding OCGA § 36-33-3.

(c) *Derivative claims.*

Because the city and Darr are entitled to summary judgment on the negligence claims, they are also entitled to summary judgment on the derivative claims for punitive damages and attorney fees. See *Wright v. Apt. Investment & Mgmt. Co.*, 315 Ga. App. 587, 590 (1) (a) n. 6 (726 SE2d 779) (2012). Moreover, Georgia law does not permit punitive damages against a governmental entity. *MARTA v. Boswell*, 261 Ga. 427, 428 (405 SE2d 869) (1991).

3. *Claims against the detention officers (Case No. A21A1251).*

Brantley argues that the trial court erred in granting summary judgment to the detention officers. As detailed below, we conclude that the officers were not entitled to summary judgment on Brantley's claims based on their alleged breach of a ministerial duty to follow the 15-minute watch procedure, so we reverse the grant of

14

summary judgment to that extent. We affirm the grant of summary judgment as to Brantley's claims based on any other allegedly negligent acts by the officers.

(a) *The trial court's rulings and the parties' arguments on appeal.*

The order on appeal contains both a ruling on the officers' entitlement to official immunity and a ruling on the merits of Brantley's negligence claim against them.

The trial court ruled that official immunity barred Brantley from proceeding against the detention officers based on some but not all of the purportedly negligent acts alleged in the lawsuit. Specifically, the trial court found

> sufficient evidence to go to a jury that [the detention officers] breached certain ministerial duties owed Ariail, specifically regarding the [s]heriff's [o]ffice['s] own written policy that Ariail, an inmate recovering from intoxication who was put in a holding cell to 'dry out' for four to six hours, was required to be monitored in-person, visually, every fifteen minutes.

So the trial court held that official immunity did not bar claims based on a breach of that particular ministerial duty. But the trial court held that the detention officers had official immunity "[t]o the extent [Brantley] argues that the [officers] should have taken some action exceeding the surveillance policy requirements[.]"

15

As to the merits of Brantley's claim, the trial court ruled that the detention officers were entitled to summary judgment because there was no evidence establishing the necessary causation between the officers' breach of their ministerial surveillance duty and Ariail's death. The trial court also considered and rejected two alternative arguments made by the detention officers: that Brantley, acting in her individual capacity, lacked standing to assert a wrongful death claim; and that the officers were entitled to summary judgment under theories of assumption of the risk and comparative fault.

On appeal, Brantley enumerates as error the trial court's merits ruling: that the employees are entitled to summary judgment because there is no genuine issue of material fact as to causation. Brantley does not enumerate as error the trial court's ruling on official immunity, and in her appellate brief she expressly declines to address the issue of the employees' entitlement to official immunity.

In response, the sheriff's office employees argue that the trial court's merits ruling on causation was correct. They also argue that, even if the trial court's causation analysis was wrong, we should affirm the grant of summary judgment as right for any reason on the other grounds that they had argued to the trial court: official immunity, standing, and assumption of the risk or comparative negligence.

16

See generally *Ga.-Pacific, LLC v. Fields*, 293 Ga. 499, 504 (2) (748 SE2d 407) (2013) ("A grant of summary judgment must be affirmed if it is right for any reason, whether stated or unstated in the trial court's order, so long as the movant raised the issue in the trial court and the nonmovant had a fair opportunity to respond.") (citation, punctuation, and emphasis omitted).

(b) *Official immunity.*

Official immunity is a threshold issue that we must address before turning to the merits of Brantley's negligence claim. See *Cameron v. Lang*, 274 Ga. 122, 124 (1) (549 SE2d 341) (2001); *Roberson v. McIntosh County School Dist.*, 326 Ga. App. 874, 876 (1) (755 SE2d 304) (2014). Even though the detention officers did not cross-appeal the trial court's ruling that official immunity did not bar claims based on an alleged breach of the written 15-minute watch procedure, we will consider their argument that the grant of summary judgment can be affirmed for this reason. See *Ga. Society of Plastic Surgeons v. Anderson*, 257 Ga. 710, 711 (1) (363 SE2d 140) (1987) ("a ruling that becomes material to an enumeration of error urged by an appellant may be considered by the appellate court without the necessity of a cross-appeal"). See also *Pearce*, 299 Ga. at 224 (affirming a judgment in favor of detention officers as right for any reason because qualified immunity barred the action, even though the

17

Court of Appeals had held that the officers were entitled to summary judgment on proximate cause grounds). So we first address the detention officers' argument that we should affirm because official immunity bars the claims arising from a breach of the 15-minute watch procedure.

But we agree with the trial court that, to the extent Brantley's negligence claim rests on the failure of the detention officers to follow that procedure, official immunity does not bar the claim. As discussed above, official immunity will bar the claim unless it is for "ministerial acts negligently performed or acts performed with malice or an intent to injure[,]" *Grammens*, 287 Ga. at 619 (citation omitted), and Brantley does not argue that the detention officers had malice or an intent to injure.

We have held, in the context of detention officers, that "the acts of following established policies of inspecting and monitoring [detainees] are ministerial tasks." *Harvey v. Nichols*, 260 Ga. App. 187, 192 (1) (b) (581 SE2d 272) (2003) (citation and punctuation omitted), disapproved on other grounds by *City of Richmond Hill v. Maia*, 301 Ga. 257, 261 (1) (800 SE2d 573) (2017). See also *Clark v. Prison Health Svcs.*, 257 Ga. App. 787, 794 (4) (c) (572 SE2d 342) (2002) (holding that "inspecting the cells in the unit according to the prescribed schedule . . . required merely the implementation of clear and certain duties, not the exercise of personal judgment[,]"

18

and so detention officers were not entitled to official immunity from a suit alleging that they had breached those duties). And the 15-minute watch procedure at issue in this case, as written, sets forth an inspection procedure that involves no exercise of discretion. Its plain language provides that if a detainee is "recovering from intoxicants," then the detainee "*shall* receive in-person surveillance of at least every 15 minutes." (Emphasis supplied.)

While there is evidence that the detention officers did not believe this written procedure meant what it said, and that in practice they exercised discretion in whether or not to perform a 15-minute watch on a detainee recovering from intoxicants, that evidence does not afford them a basis for summary judgment. At most, it creates a jury question as to what the procedure in fact required.

Viewing the evidence and all reasonable inferences therefrom in a light most favorable to Brantley, the detention officers were required to — but did not — observe Ariail in person every 15 minutes, because she was a person recovering from intoxicants. They were "thus negligent in performing their duties." *Harvey*, 260 Ga. App. at 193 (1) (b). So we cannot, under the right for any reason doctrine, affirm the grant of summary judgment to the detention officers on the ground of official immunity. See id.

(c) *Causation.*

The trial court held that the evidence did not establish the required element of proximate cause because there was "no evidence showing that if Ariail had been surveilled, in-person, at least every fifteen minutes, Ariail would not have still succeeded in hanging herself by her tank top." The trial court cited our decision in *Harvey*, supra, 260 Ga. App. 187, as authority for this holding. We agree with Brantley that the trial court's holding was erroneous and that a jury issue exists on causation because there are genuine issues of material fact regarding the foreseeability of Ariail's suicide.

(i) *A jury question exists as to proximate cause because there are genuine issues of material fact regarding the foreseeability of Ariail's suicide.*

"Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Johnson v. Avis Rent a Car System*, 311 Ga. 588, 592 (858 SE2d 23) (2021) (citation and punctuation omitted). "[W]hile proximate cause is ordinarily a jury question, it will be determined by the court as a matter of law in plain and undisputed cases." Id. at 593 (citation and punctuation omitted).

20

The detention officers argue that Ariail's suicide was an intervening act that broke any causal connection between their alleged breach of the 15-minute watch procedure and Ariail's death. But whether an intervening act breaks the causal connection turns on the act's foreseeability. As our Supreme Court has explained,

> if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

*Johnson*, 311 Ga. at 593 (citations omitted).

"[I]t has long been the rule in Georgia that, generally speaking, suicide is deemed an unforeseeable intervening cause of death which absolves the tortfeasor of liability." *City of Richmond Hill*, 301 Ga. at 259 (1). Indeed, "suicide is generally deemed an unforeseeable intervening cause as a matter of law[.]" Id. In other words, the principle that "the foreseeability of an intervening cause maintains the causal connection between the original wrongful conduct and the subsequent injury . . . does not apply to cases involving suicide. . . ." Id. (citation and emphasis omitted).

21

But there are "two deviations from the general rule that suicide breaks the causal connection between an alleged negligent act and the resulting death: the so called rage-or-frenzy exception and the special-relationship exception." *City of Richmond Hill*, 301 Ga. at 259-260 (1) (footnote omitted). The facts of this case implicate the special-relationship exception, which arises when there is "a special relationship between the tortfeasor and decedent, such as where a tortfeasor owes the unusual duty to prevent the decedent from harm. . . . This special relationship may . . . exist between a police officer or jailer and his detainee or prisoner, because a duty to protect arises under such circumstances." Id. at 260-261 (1) (citations omitted). The jail's written policies and procedures acknowledge this special relationship, stating, in a section titled "Suicide Awareness," that "[t]he special relationship that exists between the detention facility, as caretaker, and the detainee, as charged, places upon the facility a burden to protect both the safety and health of the detainee." So we are not persuaded by the detention officers' argument that, as a matter of law, they had no special relationship with Ariail.

Viewing the evidence and all reasonable inferences in the light most favorable to Brantley, we hold that a jury could find Ariail's death by suicide was a reasonably foreseeable consequence of the detention officers' failure to perform the mandated

22

15-minute watch. As stated above, the jail recognized in its written policies and procedures the potential for detainee suicides. The written policies and procedures also make clear that the 15-minute watch is a procedure meant "[t]o ensure the safety and security of inmates." The county's chief deputy, who had a role in drafting the procedure, testified by affidavit that it addressed, among other things, the needs of detainees "whose condition appears to pose a serious risk to the inmate[.]" The procedure acknowledges that there are circumstances, including instances when a detainee is recovering from intoxicants, where the more standard 30-minute surveillance interval is insufficient. This evidence supports a finding that the 15-minute watch procedure was instituted to prevent detainee self-harm, among other things.

And there is evidence that Ariail presented such a risk. The evidence, viewed in Brantley's favor, shows that Ariail was known to be under the influence of both drugs and alcohol — a combination that, according to one of the officers, required additional evaluation for possible medical intervention. The evidence also shows that, during and after she was placed by herself in the holding cell, Ariail acted in an emotionally disturbed manner. Simply put, this is not a plain and undisputed case in which there is no proximate cause as a matter of law.

23

(ii) *Harvey does not require a different result.*

Contrary to the trial court's rationale and to arguments made by the detention officers, our decision in *Harvey*, supra, 260 Ga. App. 187, does not require a different result.

As with this case, *Harvey* concerned an action against detention officers for the wrongful death of a detainee who had committed suicide. And as here, the plaintiff in *Harvey* alleged that the detention officers breached their ministerial duty to check on the detainee regularly in accordance with an established procedure. See *Harvey*, 260 Ga. App. at 192-193 (1) (b). Although there was evidence that the detention officers "did not observe [the detainee] on a regular basis and were thus negligent in performing their duties[,]" id. at 193 (1) (b), we nevertheless affirmed the trial court's grant of summary judgment because there was no justiciable issue of causation, holding that there was no proximate cause because the detainee's suicide was not foreseeable. Id. at 193-194 (2). Our decision in *Harvey* does not require us to affirm the grant of summary judgment for three reasons.

First, its foreseeability holding is now of extremely limited precedential value. In *Harvey*, we noted the general rule (discussed above in Division (3) (c) (i)) that suicide is, as a matter of law, an unforeseeable intervening act, and we found that the

24

evidence did not support the application of the rage-or-frenzy exception to that general rule because the detainee had remained "calm and controlled and appear[ed] to have known what he was doing." *Harvey*, 260 Ga. App. at 194 (2). But our Supreme Court disapproved *Harvey*'s proximate cause analysis for failing to identify and apply the special-relationship exception to the general rule that suicide is, as a matter of law, an unforeseeable intervening act. *City of Richmond Hill*, 301 Ga. at 261 (1). As discussed above, that special-relationship exception applies here.

Second, certain aspects of the *Harvey* decision on which the detention officers rely are dicta. The officers point to the *Harvey* court's observation that there was a lack of evidence "suggest[ing] that, if the surveillance protocol had been followed, [the detainee] would not have been able to take his own life," and to its observation that "[a]ny assertion that [the detainee's] attempt at suicide would have been unsuccessful if procedure had been followed [was] pure speculation." *Harvey*, 260 Ga. App. at 193-194 (2). But neither observation was necessary to *Harvey*'s ultimate conclusion that the lack of evidence supporting the application of the rage-or-frenzy exception meant there was no proximate cause. We decline to read *Harvey* to establish a bright-line rule that, to survive summary judgment, a plaintiff must point

25

to evidence showing that if the surveillance procedure had been followed the decedent would not have been able to kill himself or herself.

Finally, even if some portion of *Harvey*'s analysis remains binding precedent, its facts are distinguishable from this case. The *Harvey* decision does not set forth any particular time interval required by the procedure in that case, so we do not know how frequently the detention officers in *Harvey* would have observed the detainee had they followed the procedure. We cannot assume that the procedure in *Harvey* mandated observations with the same frequency as the 15-minute surveillance at issue here. And in *Harvey*, unlike here, the undisputed evidence showed that the detainee, prior to his suicide, had "acted in a normal fashion" toward jail personnel, that he was "under control," and that "[n]othing about his behavior suggested anything out of the ordinary or that he might be a danger to himself." *Harvey*, 260 Ga. App. at 193-194 (2).

(d) *Remaining arguments.*

We decline to affirm as right for any reason based on the detention officers' remaining arguments.

(i) *Standing.*

The detention officers argue that Brantley lacked standing to sue in her individual capacity for her mother's wrongful death because, under OCGA § 51-4-2 (a), a decedent's surviving child may bring an action for wrongful death only "if there is no surviving spouse[.]" OCGA § 51-4-2 (a). See *Brown v. Liberty Oil & Refining Corp.*, 261 Ga. 214 (1) (a) (403 SE2d 806) (1991) (OCGA § 51-4-2 "confers exclusive standing upon the surviving spouse") (citation omitted). We first note that this argument does not pertain to the claims Brantley makes in her capacity as the administrator of Ariail's estate, such as her claims for pain and suffering. So even if the officers' standing argument had merit it would support only a partial summary judgment and would not affect the trial court's jurisdiction over the suit.

But the detention officers have not shown that they are entitled to summary judgment on this ground, because the record contains no evidence that Ariail had a surviving spouse on May 7, 2019, when Brantley filed the action. The detention officers' assertion that Ariail had a surviving spouse is speculative; it is based solely on Ariail's brief references to a husband made at the time of her arrest on May 10, 2017, while she was intoxicated. We note that in her summary judgment response brief, Brantley asserted that Ariail was not married at the time of her death and that records of a Paulding County probate proceeding would demonstrate that fact, but

27

Brantley did not introduce those records into evidence. Nevertheless, viewing the evidence in the light most favorable to Brantley, as the nonmovant, we decline to exercise our discretion to affirm the summary judgment as right for any reason based on the standing argument.

(ii) *Assumption of the risk and comparative negligence.*

The detention officers argue that they are entitled to summary judgment under the doctrine of assumption of the risk, which provides that "[i]f the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover[,]" OCGA § 51-11-7, and under the doctrine of comparative negligence, which provides that a "plaintiff shall not be entitled to receive any damages if the plaintiff is 50 percent or more responsible for the injury or damages claimed." OCGA § 51-12-33 (g). They argue that these doctrines bar Brantley's claim because Ariail died by suicide. The trial court correctly rejected these arguments.

As the trial court recognized, there is no bright-line rule in Georgia under which the doctrines of assumption of the risk and comparative negligence always bar recovery in cases of suicide. To the contrary, we have recognized that determining a person's assumption of the risk when that person has killed himself or herself can be

28

a fact-intensive inquiry appropriate for a jury. See *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 116-119 (3) (c) (372 SE2d 265) (1988). And, even in a case involving suicide, "the degree that the defense[ ] of comparative . . . negligence [is] applicable [is a] matter[ ] for the jury's consideration and [is] not determinable as a matter of law." Id. at 119 (4). See also OCGA § 51-12-33 (a) ("the trier of fact . . . shall determine the percentage of fault of the plaintiff"). Viewing the facts in the light most favorable to Brantley, we agree with the trial court that the detention officers have not shown they are entitled to summary judgment based on theories of assumption of the risk or comparative negligence.

(e) *Conclusion*.

In summary, the trial court correctly held that official immunity did not bar Brantley from pursuing negligence claims against the detention officers based on their alleged breach of their ministerial duty to conduct visual surveillance of Ariail every 15 minutes. But contrary to the trial court's conclusion, whether any breach of that ministerial duty proximately caused Ariail's death is a jury question. And the detention officers' other arguments do not support an affirmance as right for any reason.

So we reverse the grant of summary judgment to the detention officers to the extent it concerns alleged breaches of their ministerial duties under the 15-minute watch procedure. But because the trial court ruled that official immunity barred Brantley's action against the detention officers for any other acts of alleged negligence, and Brantley did not enumerate that ruling as error, we affirm that aspect of the trial court's order. See generally *Smyrna Dev. Co. v. Whitener Ltd. Partnership*, 280 Ga. App. 788, 790 (1) (635 SE2d 173) (2006) ("a party cannot expand his enumerations of error through argument or citation in his brief") (citation and punctuation omitted).

*Judgment affirmed in Case No. A21A1252. Judgment affirmed in part and reversed in part in Case No. A21A1251. Rickman, C. J., and Senior Appellate Judge Herbert E. Phipps concur*.