**SECOND DIVISION**
**RICKMAN, P. J.,**
**GOBEIL and DAVIS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 24, 2025**

# In the Court of Appeals of Georgia

A25A0674. SMITHERS et al. v. TWEEDY.

DAVIS, Judge.

In this wrongful death action stemming from the tragic death of a prison inmate by suicide, Donna and Stephen Smithers, as surviving parents and personal representatives of their son Dakota Lee Smithers' estate, appeal from the trial court's order granting Deputy Ta'Tanisha Tweedy's motion for summary judgment and denying their motion for partial summary judgment. On appeal, the Smithers argue that (1) Deputy Tweedy was engaged in a ministerial duty at the time Dakota committed suicide and was therefore not entitled to official immunity; and (2) Deputy Tweedy's negligence was the proximate cause of Dakota's death. After a careful review of the record, we conclude that Deputy Tweedy had a discretionary duty to

monitor the jail's security cameras, and we therefore affirm the trial court's order granting Deputy Tweedy's motion for summary judgment and denying the Smithers' motion for partial summary judgment.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from an order either granting or denying summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation omitted.) *Whitcomb v. Bank of America, N. A.*, 365 Ga. App. 795, 795-796 (880 SE2d 310) (2022).

So viewed, the record shows that the Bibb County Law Enforcement Center in Macon, Georgia, houses hundreds of individuals charged or convicted of misdemeanor and felony offenses. The control booth of East Control at the jail has two monitors that each display video footage from 25 surveillance cameras that cover the C and D blocks of the facility. The responsibilities and duties of each officer at the jail are outlined in a manual entitled, "General Post Orders." For Wing Control Officers, the manual states: "The Wing Control Officer will monitor and control the safety, security and sanitation of the facility wings through the use of visual

surveillance, video surveillance, control of security doors/gates and the use of the intercom system. He/She will perform all functions in an efficient and secure manner." Bibb County Sheriff David Davis explained that officers had to follow the General Post Orders and that, "in the strictest sense," officers working in the control booth were required to "keep [an] eye" on the monitors. He also explained, however, that

> deputies are expected and authorized to exercise considerable judgment in determining how, when, and in what order or priority post activities are accomplished during the course of any duty shift[,]" . . . [and that] "deputies are also expected to exercise and apply good judgment in determining timing, frequency, and priority of specified duties depending on a host of conditions, circumstances, and considerations relevant to real-world operation of the jail on any given day and during any given shift.

In 2020, Deputy Tweedy was working at the jail as a Wing Control Officer in East Control, and she was aware that she was required to monitor the video cameras while working in the control booth. Around that time, Dakota had been arrested for loitering and prowling and was incarcerated at the facility. According to an internal

investigation report, Dakota was transferred to the D block after a fight with another inmate, and he received threats from other inmates that they were going to "get him." On February 13, 2020, at approximately 11:28 a.m., two deputies began passing out lunch to the inmates. Instead of monitoring the inmates on the surveillance cameras, Deputy Tweedy, who was alone in the control booth, "watch[ed]" the deputies as they handed out lunch.[1] Around that same time, video surveillance cameras showed Dakota begin to commit suicide by tying a bed sheet to the top bar of his cell door. At 11:57 a.m., Dakota "appeared motionless" with his back against the cell door and a sheet wrapped around his neck. Deputy Tweedy went to get lunch around noon and took it back to the control booth. At 2:29 p.m., a deputy who was checking on another inmate in the D block found Dakota hanging from the bed sheet. Dakota was taken to the Navicent Health Medical Center, where he was pronounced dead. His cause of death was listed as asphyxia due to hanging.

---

[1] Deputy Tweedy testified that "maintain[ing] visual of the officers when they're on the block" was also a "main" part of her responsibilities.

The Smithers filed a wrongful death complaint against the jail's medical providers, Deputy Tweedy, and several other deputies at the facility.[2] The Smithers filed a motion for partial summary judgment, arguing in part that Deputy Tweedy was not entitled to official immunity because she owed a ministerial duty to monitor the facility through the video surveillance monitors. Deputy Tweedy answered the complaint and filed a motion for summary judgment, arguing that she was entitled to official immunity and that the Smithers could not establish that she was the proximate cause of Dakota's death. Following a hearing,[3] the trial court granted Deputy Tweedy's motion for summary judgment and denied the Smithers' motion for partial summary judgment. The trial court determined that Deputy Tweedy's duty to monitor the facility through the video surveillance cameras was a discretionary act, reasoning that Deputy Tweedy "had numerous other duties to perform, and her job required her to exercise deliberation and judgment about what she should do at any moment based on the situation." Thus, the trial court concluded that "[i]n performing her functions of monitoring and controlling the safety, security, and

---

[2] The Smithers settled their claim against the medical providers and dismissed their complaint against the other deputies.

[3] The transcript of the hearing is not included in the record on appeal.

5

sanitation of the East Wing, she exercised her discretion to provide visual surveillance on the people in the cell block rather than the video surveillance of the 50 camera views on screens." This appeal followed.

1. First, the Smithers argue that the trial court erred by determining that Deputy Tweedy was entitled to official immunity because her duty to monitor the facility through the video surveillance cameras was a ministerial duty. After a careful review of the facts and the relevant law, we disagree.

"The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity." (Citation omitted.) *Siegrist v. Herhold*, 365 Ga. App. 828, 830 (880 SE2d 336) (2022). "Under Georgia law, official or qualified immunity is an entitlement not to stand trial rather than a mere defense to liability. The issue of a government employee's official immunity must therefore be resolved as the threshold issue in a suit against the employee in his personal capacity." *Roberson v. McIntosh County School Dist.*, 326 Ga. App. 874, 876 (1) (755 SE2d 304) (2014).

> Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under

Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure. The rationale for this immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight.

(Citation omitted.) Id. at 876-877 (1). "[A] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." (Citation and punctuation omitted.) *Siegrist*, supra, 365 Ga. App. at 830 (a). It is true that "[a] ministerial duty may be established by evidence such as a written policy, an unwritten policy, a supervisor's specific directive, or a statute[,]" (Citation omitted.) *Wilson v. Anderson*, 374 Ga. App. 668, 670 (1) (913 SE2d 813) (2025), and "[w]here there is an established policy requiring an official to take specified action in a specified situation, the policy creates a ministerial duty on the part of the official to perform the specified task." (Citation omitted.) *Melton v. McCarthan*, 356 Ga. App. 676, 677 (848 SE2d 684) (2020); see also *Standard v. Hobbs*, 263 Ga. App. 873, 876 (1) (589 SE2d 634) (2003) ("[W]hen a governmental department creates its own policy requiring certain actions under certain situations, then the actors for that department have a ministerial duty

to follow the policy. Obedience of the departmental policy is ministerial.") (citation and punctuation omitted). On the other hand, "discretionary acts" are acts that "call[] for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." (Citation omitted.) *Lowe v. Etheridge*, 361 Ga. App. 182, 184 (1) (862 SE2d 158) (2021). Therefore, the Supreme Court of Georgia has been clear that, "even when an officer clearly owes a duty of care and is absolutely required to do *something*, unless she has been commanded — by law or by the policy or directive of her employer — to do a *particular thing*, she still is engaged in the performance of a discretionary function." (Citation omitted.) *Barnett v. Caldwell*, 302 Ga. 845, 848-849 (II) (809 SE2d 813) (2018). "Whether an action is discretionary or ministerial depends on the character of the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." (Citation and punctuation omitted.) *Siegrist*, supra, 365 Ga. App. at 831 (a).

With these principles in mind, we conclude that Deputy Tweedy had a discretionary duty to monitor the facility through the video surveillance cameras. It is true, as the Smithers point out, that the General Post Orders policy requires Wing

Control Officers to monitor the facility through the video surveillance cameras; Deputy Tweedy admitted that she was required to monitor the video cameras while working in the control booth; and Sheriff Davis testified that the deputies had to follow the General Post Orders and that, "in the strictest sense," officers working in the control booth were required to "keep [an] eye" on the monitors. But in explaining the General Post Orders and the duties of the deputies, Sheriff Davis clarified that

> deputies are expected and authorized to exercise considerable judgment in determining how, *when*, and in what order or priority post activities are accomplished during the course of any duty shift[,]" . . . [and that] "deputies are also expected to exercise and apply good judgment in determining timing, frequency, and priority of specified duties depending on a host of conditions, circumstances, and considerations relevant to real-world operation of the jail on any given day and during any given shift.

(Emphasis supplied.) Hence, the General Post Orders and Sheriff's Davis' directive establish that the policy to monitor the facility's video surveillance cameras calls for deputies at the facility, including Wing Control Officers, to exercise personal deliberation and judgment in determining *when and how* their numerous duties should be carried out. Specifically, Deputy Tweedy had to examine the conditions,

circumstances, and needs of the facility in order to reach a conclusion as to which duty should be carried out at any particular time. Thus, "what should be done always will depend to some extent on the circumstances. And that means that the duty cannot — when applied to a public officer — be characterized properly as a ministerial one." (Citation and punctuation omitted.) *Barnett*, supra, 302 Ga. at 850 (II) In short, "the wisdom of an employee's conclusion is not the question we evaluate; instead, we are tasked with discerning whether the employee had a range of options to choose from based on her own judgment. And in a situation where an official has th[is] sort of discretion, the official is shielded from personal liability for the choices she makes[.]" *Barnett*, supra, 302 Ga. at 850 (II) (school policy that forbid students from being left unattended imposed a discretionary duty on teachers to supervise the students because there was nothing in the policy that required teachers to maintain a constant visual observation of the students); *Grammens v. Dollar*, 287 Ga. 618, 620-621 (697 SE2d 775) (2010) (school policy that required students to wear protective eye equipment was discretionary act because students only had to wear the eye equipment when handling "explosive materials," which was not defined in the policy, thereby requiring teachers to use their judgment in determining when students were handling

explosive materials to trigger the requirement to wear the eye equipment); *Ortega v. Coffey*, 348 Ga. App. 794, 798 (2) (824 SE2d 690) (2019) (duty to inspect roadway was a discretionary duty because there was no policy or directive establishing the manner in which the employee was required to inspect or maintain the roadway).[4] Consequently, the trial court correctly determined that the duty to monitor the facility through the video surveillance cameras was a discretionary duty.

2. Next, the Smithers argue that genuine issues of fact remain as to whether Deputy Tweedy's failure to monitor the facility through the video surveillance cameras was the proximate cause of Dakota's death. In light of our conclusion above in Division 1, it is unnecessary for us to address this claim of error.

---

[4] The cases upon which the Smithers rely to support their ministerial duty claim, *Harvey v. Nichols*, 260 Ga. App. 187 (581 SE2d 272) (2003), overruled on other grounds, *City of Richmond Hill v. Maia*, 301 Ga. 257 (800 SE2d 573) (2017) and *Lundy v. Hancock County*, 368 Ga. App. 772 (890 SE2d 92) (2023), are factually inapposite and do not provide a basis to reverse the trial court's order. Although those cases both contained duties that had to be performed, unlike the instant case, none of those cases contained evidence that the public officials involved had *any* discretion as to how those duties were to be carried out.

In sum, for the foregoing reasons, we affirm the trial court's order granting Deputy Tweedy's motion for summary judgment and denying the Smithers' motion for partial summary judgment.

*Judgment affirmed. Rickman, P. J., and Gobeil, J., concur.*